# IN THE SUPREME COURT OF IOWA

No. 12–0098

Filed November 16, 2012

**MICHELLE POSTELL,**

Appellant,

vs.

**AMERICAN FAMILY MUTUAL INSURANCE CO.,**

Appellee.

Appeal from the Iowa District Court for Scott County, John D. Telleen, Judge.

An insured appeals an adverse judgment denying her coverage as an innocent coinsured spouse under her homeowner's policy. **AFFIRMED.**

Joseph C. Creen of Bush, Motto, Creen, Koury & Halligan, P.L.C., Davenport, for appellant.

Ted J. Wallace, Davenport, for appellee.

**WIGGINS, Justice.**

This case involves the denial of coverage under a fire insurance policy. The policy included an intentional loss exclusion, voiding coverage when any insured intentionally causes a loss or damage. The district court denied coverage. In this appeal, we find substantial evidence supports the district court's finding that the coinsured who set fire to the insured dwelling in order to commit suicide had the requisite intent to "cause a loss" under the policy. We further find that under the language of the policy, the innocent coinsured spouse, who did not participate in the intentional acts of the other coinsured, cannot recover due to the intentional loss exclusion. Finally, we hold that the innocent coinsured cannot recover under the recently amended Iowa standard fire policy in Iowa Code section 515.109 (2009). Accordingly, we affirm the judgment of the district court.

## I. Background Facts and Proceedings.

**A. The Fire.** Michelle and David Postell were married for thirty-one years. Since 1989, they resided at a home in Dixon. The couple owned the house as joint tenants.

Throughout their marriage, David and Michelle struggled with marital problems. Michelle had left David numerous times because he was verbally, physically, and emotionally abusive, but the couple always reconciled. She permanently separated from him in January 2009 and was in the process of seeking a divorce. During that time, Michelle still considered the house to be her residence and planned to return there after David moved out.

Accordingly, Michelle informed David that she was filing for divorce. He responded "the marriage wasn't going to be over until he

said it was over." Michelle testified that he then "offered to shoot me and kill himself."

Thereafter, David became depressed and suicidal. On Super Bowl Sunday in 2009, approximately one week before the fire, he attempted suicide with a gun. David called the police and told them "they needed to come and clean up the mess." A sheriff's deputy arrived in time to stop the attempt. The family subsequently removed all firearms from the house.

On Saturday, February 14, David left a voicemail for Michelle, telling her "this is a Valentine's Day you will remember for the rest of your life." He detailed how he had poured gasoline throughout the house, turned on the stove, and lit candles. He said that if Michelle did not want him, "he would take care of the problem and he was going to blow himself up."

Later that day, the couple's son, Jared, called his father who was asleep at the house. Jared testified that David sounded very jovial and indicated surprise at talking to his son. David told Jared that he had gotten five-gallon gasoline cans, spread gasoline throughout the house, lit candles, turned on the stove, and laid down, not planning to wake up. David asked his son to call Michelle to tell her about "all of this" so she would feel pain. While on the phone with his father, Jared heard his brother's fiancée, Amanda, arrive at the house. Jared overheard David tell her, "[G]et out of here because . . . the house is going to blow."

Amanda reported to police that she smelled a strong odor of gasoline when she entered the house. When she went further inside, she saw numerous large gasoline cans tipped over and observed the carpet was so soaked with gasoline that it was "as if someone had dumped water all over it." In addition, she said the smell of gasoline was so

strong her eyes were tearing up and her throat felt like it was closing. She then saw David with a lighter clenched in his right hand and heard him yell that she should get out of the house because he was going to "blow it!"

Another son, Justin, then arrived at the scene. He spoke with his father on the phone. David told him that if he or anyone else came near the house he would light it on fire.

David's friend, Michael Rowe, arrived at the house after Justin called. Michael said David was planning to blow up the house with him inside. He kicked down the door to the residence and entered. He also indicated the odor of gasoline was so strong his eyes watered. Michael reported to police that he saw smoke coming from the living room where he also observed a five-gallon, red plastic gasoline can on the floor. David continuously told him to get out. Specifically, David told him to "get the f___ out," and "it's fixing to go."

David subsequently set fire to the residence. Justin was still talking to his father on the phone at the time he reportedly lit the curtains on fire. David sustained burns on sixty to seventy percent of his body. Nonetheless, medical records indicate David was alert and walked into the emergency room. Both en route to and initially at the emergency room, David refused treatment. He gave medical personnel a full rendition of his story and his concerns about wanting to die.

Medical records show that David said he had "[lit] his house on fire in an attempt to kill himself with what he reports was going to be much better for all of them." Elsewhere, the medical staff recorded how David attempted suicide by pouring gasoline on himself and his home and lit himself on fire.

Medical treatment only commenced after personnel informed David that he was mentally ill and they would restrain him if he did not cooperate. David died due to his injuries three days after the fire.

The same day as the fire, an agent from the Iowa State Fire Marshal's office conducted an investigation at the house. He smelled gasoline throughout the residence. He determined that two separate fires were set—one in the bedroom and one in the living room. In the bedroom, he observed ignitable liquid pour patterns. In the living room, he found a red plastic receptacle which, when tested at the laboratory, contained the presence of gasoline. The agent also noticed the stovetop and oven were on. He concluded that David had poured gasoline throughout the house and the cause of the fire was arson.

It is uncontested Michelle had no role in setting or contributing to the fire.

**B. American Family Policy.** Michelle and David purchased a residential fire insurance policy from American Family Mutual Insurance Company at the time they moved into the residence. Michelle paid all the premiums. The parties stipulated the policy was effective on the day of the fire. It is undisputed that David and Michelle Postell are the "named insureds" of the policy.

Section I of the American Family policy provides replacement coverage for fire damage caused to the insured dwelling and personal property contained therein, as well as loss of use. However, it only covers damage from "accidental direct physical loss," subject to exclusions. The exclusions section, which applies to coverage of the dwelling, personal property, and loss of use, indicates:

**We**[1] [American Family] do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

. . . .

2. **Intentional Loss**, meaning any loss or damage arising out of any act committed:

   a. by or at the direction of *any **insured***; and

   b. with the intent to cause a loss.

(Emphasis added.)

Michelle testified she was aware the policy included an intentional loss exclusion. However, she thought each person under the policy was a separate insured.

The policy includes two other provisions, pertaining to actions by the insured parties, which result in denial of coverage:

**Part A**

. . . .

2. **Neglect** of *any **insured*** to use all reasonable means to protect covered property at and after the time of loss.

. . . .

**Part B**

. . . .

1. **Fraud. We** will not provide coverage for all or any part of a loss if, before or after the loss, *any **insured*** has committed fraud. Fraud means any concealment, misrepresentation or attempt to defraud by *any **insured*** either in causing any loss or in presenting any claim under this policy.

(Emphasis added.)

---

[1]The policy indicates: "**The following words in this policy have defined meanings. They will be printed in bold type.**" This bolding has been preserved throughout the opinion.

Section II of the policy contains the conditions to coverage. Those conditions only apply to "Section II of this policy." The severability clause in section II states: "This insurance applies separately to each insured. This condition will not increase our limit for any one occurrence."

After the fire, on August 11, Michelle submitted a proof of loss claim to American Family for recovery under the fire insurance policy. Michelle reported losses in the amount of $195,902.28 for buildings, $44,140.96 for personal property, and $3786 for loss of use.

**C. Proceedings.** On February 20, LaSalle Bank, the mortgage holder on the property, filed a petition for foreclosure on the destroyed residence. On December 11, Michelle filed a cross petition against third-party defendant, American Family, for denying her proof of loss claim and refusing to pay under the fire insurance policy. LaSalle Bank dismissed its petition with prejudice on June 3, 2010, because American Family paid off the mortgage under the fire insurance policy.

American Family filed a motion for summary judgment. American Family argued that since David intentionally set fire to the residence, Michelle could not recover under the policy's intentional loss exclusion. Michelle filed a cross motion for partial summary judgment.

The district court denied both American Family's motion for summary judgment and Michelle's motion for partial summary judgment. First, the court found there was no genuine issue of material fact that David intentionally lit the fire or caused a loss to the residence.

Second, the district court considered whether an innocent coinsured could recover under the policy that included an intentional loss exclusion. The district court could not find the legislature intended to overrule our decision in *Sager v. Farm Bureau Mutual Insurance Co.,*

680 N.W.2d 8 (Iowa 2004), when it amended the Code in 2005. In *Sager*, we held the standard fire insurance form required by the legislature prohibited an insurance company from applying the intentional loss exclusion to a coinsured who did not participate in the intentional act.[2] 680 N.W.2d at 12–14. Thus, although the district court found here that the language, "any insured," in the American Family policy barred coverage, it refused to uphold the exclusion under *Sager*. Though the district court found Michelle was entitled to replacement coverage, it denied her motion for partial summary judgment because damages, breach of contract, and affirmative defenses still had to be resolved.

At trial, the district court informed counsel it was not bound by the summary judgment ruling and accordingly, reached a different conclusion. The district court held that the statutory amendment allows American Family, under the policy as written, to deny coverage to an innocent coinsured. Michelle did not ask for a continuance so she could prepare further.

After a trial on the merits, the district court found David intended to cause damage to the residence. The district court also found the 2005 amendments overruled our decision in *Sager*. Thus, the intentional loss exclusion applied, and Michelle had no coverage for the fire started by David, a coinsured. On this basis, the district court dismissed Michelle's petition.

Michelle appeals.

---

[2]At the time we decided *Sager v. Farm Bureau Mutual Insurance Co.*, 680 N.W.2d 8 (Iowa 2004), the standard fire insurance policy was found at 515.138 (2003). It is now located at Iowa Code section 515.109 (2009).

**II.  Issues.**

On appeal, Michelle asks us to decide whether the suicidal coinsured, David, who set fire to the insured house, formed the requisite intent to cause a loss within the meaning of the American Family policy's intentional loss exclusion; whether an innocent coinsured, Michelle, may recover under the American Family policy which excludes coverage when "any insured" causes an "intentional loss"; and whether an innocent coinsured, Michelle, may recover under the standard fire policy in section 515.109, which denies coverage when "an insured" "causes or increases" a hazard to the insured property.

**III.  Standard of Review.**

When the district court determines the meaning of words used in a contract, it interprets the contract. *Am. Soil Processing, Inc. v. Iowa Comprehensive Petroleum Underground Storage Tank Fund Bd.*, 586 N.W.2d 325, 329 (Iowa 1998).  When the court decides the legal effect of such words, it construes the contract.  *Id.*  Our review of the district court's construction of the contract is for errors at law.  *Id.*  Similarly, we review the district court's interpretation of the contract for errors at law, unless the court used extrinsic evidence to interpret the words of the contract.  *Id.*  If extrinsic evidence is used, the trial court's fact findings are binding on appeal if supported by substantial evidence.  *Hartig Drug Co. v. Hartig*, 602 N.W.2d 794, 797 (Iowa 1999).

We view the evidence in the light most favorable to the judgment when a party argues the trial court's ruling is not supported by substantial evidence.  *Fischer v. City of Sioux City*, 695 N.W.2d 31, 33 (Iowa 2005).  Evidence is substantial when reasonable minds accept the evidence as adequate to reach a conclusion.  *Id.*  "Evidence is not insubstantial merely because we may draw different conclusions from it;

the ultimate question is whether it supports the finding actually made, not whether the evidence would support a different finding." *Raper v. State*, 688 N.W.2d 29, 36 (Iowa 2004).

Finally, we review questions of statutory construction for correction of errors at law. *Estate of Ryan v. Heritage Trails Assocs., Inc.*, 745 N.W.2d 724, 728 (Iowa 2008).

**IV. Analysis.**

We first must determine under the facts of this case whether substantial evidence supports the district court's finding that David had the requisite intent to cause a loss under the fire insurance policy. If it does, we must next decide if American Family is required to pay the innocent coinsured spouse for the resulting fire loss under the replacement policy which excludes coverage when any insured causes intentional loss to the insured premises. Finally, we must decide if the intentional loss exclusion is enforceable in light of the legislative changes to section 515.109.

**A. David's Intent to Cause a Loss.** Insurance companies "ha[ve] a duty to define any limitations or exclusionary clauses in clear and explicit terms." *Allied Mut. Ins. Co. v. Costello*, 557 N.W.2d 284, 286 (Iowa 1996). The insurer bears the burden of showing the exclusion applies. *Id.* " '[E]xclusions will be strictly construed against the insurer.' " *Am. Family Mut. Ins. Co. v. Corrigan*, 697 N.W.2d 108, 111 (Iowa 2005) (quoting *Kalell v. Mut. Fire & Auto. Ins. Co.*, 471 N.W.2d 865, 867 (Iowa 1991)).

If the policy does not define a term, we give the term its ordinary meaning. *Interstate Power Co. v. Ins. Co. of N. Am.*, 603 N.W.2d 751, 754 (Iowa 1999). When doing so, we must construe the policy as a whole. *Greenfield v. Cincinnati Ins. Co.*, 737 N.W.2d 112, 118 (Iowa 2007). The

court adopts the construction most favorable to the insured when the insurance policy is ambiguous, requires interpretation, or is open to two equally plausible constructions. *Hamm v. Allied Mut. Ins. Co.*, 612 N.W.2d 775, 778 (Iowa 2000). We do so because insurance policies constitute adhesion contracts. *Costello*, 557 N.W.2d at 286.

The American Family policy's intentional loss exclusion has three parts. First, it requires intentional loss. This is defined in the policy as "*any* loss or damage arising out of *any* act." (Emphasis added.) The evidence easily satisfies the plain language of this destructive act requirement. David's conduct of pouring gasoline in the house and lighting it caused extensive damage to the structure.

Second, the policy requires the act be committed "by or at the direction of *any* **insured**." (Emphasis added.) This is the actor requirement. Here, the policy lists the "named insured" as "Postell, David & Michelle."[3] "**Insured**" means "**you**." The policy defines "**You**" as "the person or people shown as the named **insured**." The definitions section also indicates that each person described under the policy as an "**insured**" is a "separate **insured**."

Thus, acts conducted by or at the direction of either one may result in intentional loss pursuant to the policy. Since David is an eligible actor, his intentional acts alone may trigger the exclusion. Our jurisprudence supports this interpretation.

---

[3]Michelle argues that the use of the ampersand indicates that the "named **insured**" are a unit: both David and Michelle. She claims that such use of a conjunctive "&" between the names indicates that *both* parties must act in concert before the exclusion is triggered. The definitions refute this construction: "**you**" means an "**insured**," and "**you**" refers to "the person *or* people shown as the named **insured**." (Emphasis added.)

We have previously established that when an intentional loss exclusion refers to the actions of "an," "a," or "any" insured, the policy refers to *either* party. *See Sager*, 680 N.W.2d at 11–12 (finding that under the insurance company's policy, the innocent spouse would be barred from recovery because it applies to intentional acts of "an insured"); *Webb v. Am. Family Mut. Ins. Co.*, 493 N.W.2d 808, 813 (Iowa 1992) (denying coverage to innocent coinsured spouse when husband materially misrepresented the amount of loss under policy excluding coverage for fraud by "any insured"); *Vance v. Pekin Ins. Co.*, 457 N.W.2d 589, 593 (Iowa 1990) (holding that coinsured spouse was barred from recovery under the policy referring to "an insured" for intentional loss caused by husband convicted of arson).

The exclusion's third prong is the intent requirement. The policy indicates the actor must commit the destructive act "with the intent to cause a loss." The policy does not define "intent" or "loss," so we must rely on other sources to ascertain the common meaning of these terms.

Michelle argues substantial evidence does not support the trial court's finding that David acted with the intent to cause a loss within the meaning of the American Family policy's intentional loss exclusion. Instead, she claims David suffered from a mental defect causing an "uncontrollable impulse to commit suicide by fire." We disagree.

Intent is defined as "[t]he state of mind accompanying an act."[4] *Black's Law Dictionary* 881 (9th ed. 2009). In the context of an intentional loss exclusion, we recognize the intent of an individual to cause an injury may be "actual or may be inferred by the nature of the

---

[4]David's actions constitute arson. The Iowa Code defines the scienter requirement for arson as "inten[t] to destroy or damage" or "knowingly endanger[]" the property. Iowa Code § 712.1 (2009).

act and the accompanying reasonable foreseeability of harm." *Altena v. United Fire & Cas. Co.*, 422 N.W.2d 485, 488, 490 (Iowa 1988) (citation and internal quotation marks omitted) (inferring insured's intent to do the act *and* cause injury to victim by sexual acts under the policy's intentional act exclusion); *see also Amco Ins. Co. v. Haht*, 490 N.W.2d 843, 845 (Iowa 1992). Thus, we consider the individual's objective intent, not subjective intent.[5] Additionally, once we find the malfeasant insured had the intent to cause the injury, "it is immaterial that the actual injury caused is of a different character or magnitude than that intended." *Altena*, 422 N.W.2d at 488 (citation and internal quotation marks omitted).

Substantial evidence supports the district court's finding that David did not suffer from a mental defect causing him to have an uncontrollable impulse to commit suicide by fire. Substantial evidence also supports the district court's finding that David did have the requisite intent to destroy the house in his suicide attempt.

The record supports a finding that David was capable of forming intent and did not act under an irresistible impulse, because he acted premeditatedly (in both previously attempting suicide and planning the house fire), with the awareness of the nature and consequences of his actions. Furthermore, the record lacks any evidence that David was hallucinating, deranged, or delusional. *See Costello*, 557 N.W.2d at 286–

---

[5]Our prior cases dealt specifically with intentional *injury* exclusions, which prohibit coverage for acts causing personal injury. *See Amco Ins. Co. v. Haht*, 490 N.W.2d 843, 845 (Iowa 1992); *Altena v. United Fire & Cas. Co.*, 422 N.W.2d 485, 490 (Iowa 1988) (inferring from the insured's acts that he had the intent to cause injury, per the policy's intentional acts exclusion, to victim of sexual assault). If we are willing to infer intent to cause *injury to a person* from the insured's acts, it seems logical we would do the same for the (arguably) less serious offense of *injury to property*.

88 (declining to adopt a legal standard when an insured's mental illness will negate an intentional exclusion clause in an insurance policy where the court finds the actor was not mentally ill at the time the insured committed the act).

The record supports the district court finding that on the day of the fire, David was mentally alert, orientated, and acted with calculation. Specifically, prior to the fire, he purchased twenty-five gallons of gasoline. He then spread the gasoline throughout the house. He lit candles. He turned on the stove. He then recounted these details to Michelle and his son, demonstrating he understood the nature of his conduct. In particular, he recognized the events he had set in motion would result in his death and in "blow[ing] up the house."

David understood the consequences of his acts, specifically, the danger he was creating by lighting the house on fire. This is demonstrated through the concern he showed for other's safety. Specifically, he warned his son's fiancée, Amanda, and his friend, Michael, to get out because the house was going to "blow," and he did not want anyone else to die.

Even after the fire, David was responsive, descriptive as to how he set the fire, and alert. Medical records indicate that he walked into the emergency room. He did not act in a trance, but rather, was coherent and comprehended the entirety of the event, as indicated in medical records that reported he provided staff with a full rendition of his story and his concerns about wanting to die. Moreover, he was alert enough both en route to the hospital and once in the emergency room to refuse treatment and to tell personnel he just wanted to die.

Additionally, after the fire, we have Michelle's admissions that David intended to set the fire. Michelle admitted: "Yes *David set the fire*, he lost his life, *that was his intention*." (Emphasis added.)

This third prong also requires that we find David intended to cause a loss. Loss is defined as "[a]n undesirable outcome of a risk; the disappearance or diminution of value, usu[ally] in an unexpected or relatively unpredictable way." *Black's Law Dictionary* 1029. For insurance purposes, loss is "[t]he amount of financial detriment caused by an insured person's death or an insured property's damage, for which the insurer becomes liable." *Id.* at 1030. The American Family policy clearly indicates that, under the intentional loss exclusion, "[s]uch loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss."

Substantial evidence also supports the district court's finding that David intended to cause a loss, because he repeatedly acknowledged the threat of property damage. He told at least three witnesses to the event that the house was going to "blow." He explained to his son that after pouring gasoline in the house, lighting candles, and turning on the stove, he did not plan to wake up. This demonstrates the fact that he intended to incinerate himself by burning the house down, thereby creating a loss. In addition, David told Michelle in the voicemail that he was going to use the house fire as a way to "blow himself up."

While it is true David acted ultimately with the intent to commit suicide, our court of appeals has recognized the "intent to commit suicide [by setting fire to property] does not negate the existence of the intent to commit intermediate acts necessary to achieve the ultimate objective." *See State v. Bartnick*, 478 N.W.2d 878, 880 (Iowa Ct. App. 1991). "[T]he existence of the intent to commit suicide does not negate the existence of

the knowledge the property would be damaged or destroyed by the alleged suicide attempt." *Id.*

Thus, because we find substantial evidence supports the district court's finding that David acted intentionally in setting the fire, Michelle is not entitled to recovery, unless she can demonstrate a right to compensation under the American Family policy or the standard fire insurance policy found in section 515.109.

**B. Recovery Under the Policy.** Michelle makes three arguments to support her claim for recovery under the language of the policy issued by American Family. First, she argues that under the policy, she is an innocent spouse. Next, she asserts that a severability clause in the policy provides coverage. Finally, she makes a claim for recovery under the doctrine of reasonable expectations.

1. *Innocent coinsured doctrine.* Michelle's right to compensation from American Family hinges upon the interpretation of the policy. Determining Michelle's rights requires us to engage in a two-part analysis, as we did in *Sager.* 680 N.W.2d at 11–12. First, the court looks at the innocent coinsured's rights under the language of the insurance policy. *Id.* If that policy denies coverage, then the court considers the coinsured's potential recoverability under the standard policy to determine the statutory minimum protection to which the insured is entitled. *Id.*; *see also* Iowa Code § 515.109.

We apply the "best reasoned rule" to the American Family policy when construing the provisions of the company's insurance policy. *Vance*, 457 N.W.2d at 592. Under this approach, we interpret the exclusion using contract theories "peculiar to insurance policies." *Id.* Accordingly, we no longer focus on property theories or marital relationships. *Id.*

To begin, we conduct a textual analysis of the American Family policy. It contains three relevant exclusions to coverage, all of which are contingent upon the conduct of the insured persons. First is the intentional loss exclusion:

> **We** [American Family] do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.
>
> . . . .
>
> 2. **Intentional Loss**, meaning any loss or damage arising out of any act committed:
>
>> a. by or at the direction of *any **insured***; and
>>
>> b. with the intent to cause a loss.

(Emphasis added.)

Second, the policy includes exclusions for neglect and for fraud:

**Part A**

. . . .

> 2. **Neglect** of *any **insured*** to use all reasonable means to protect covered property at and after the time of loss.

. . . .

**Part B**

. . . .

> 1. **Fraud. We** will not provide coverage for all or any part of a loss if, before or after the loss, *any **insured*** has committed fraud. Fraud means any concealment, misrepresentation or attempt to defraud by *any **insured*** either in causing any loss or in presenting any claim under this policy.

(Emphasis added.) Each of these exclusions refers to "*any* insured." Although the intentional loss exclusion is only at issue in this case, we look to all three exclusions to properly interpret the whole policy.

It is well-settled law in this state that the use of the words, "*any* insured,*"* is an unambiguous phrase that precludes coverage for *all* insureds, including an innocent coinsured spouse. *See Corrigan*, 697 N.W.2d at 116 (finding "any insured" bars recovery); *Sager*, 680 N.W.2d at 11–12 (recognizing that if "any insured" sets fire to a house, all insureds, including the innocent coinsured spouse, are barred compensation); *Johnson v. Farm Bureau Mut. Ins. Co.*, 533 N.W.2d 203, 207 (Iowa 1995) (holding that "any insured" resulted in denial of coverage to all insureds under the exclusion for bodily injury); *Webb*, 493 N.W.2d at 813 (denying coverage to innocent coinsured spouse whose husband materially misrepresented the amount of loss under the policy excluding recovery for fraud by "any insured"); *Vance*, 457 N.W.2d at 593 (explaining "any insured" unambiguously excludes coverage to an innocent coinsured spouse). In *Vance*, we went so far as to encourage insurance companies to purge their fire insurance policies of ambiguity by replacing the exclusion language of "the" insured with "a," "any," or "an" insured. 457 N.W.2d at 593 (citing Leane English Cerven, *The Problem of the Innocent Co-insured Spouse: Three Theories on Recovery*, 17 Val. U. L. Rev. 849, 872 (1983)). This rule is consistent with other jurisdictions.[6]

---

[6]*See Chacon v. Am. Family Mut. Ins. Co.*, 788 P.2d 748, 752 (Colo. 1990) (finding "any insured" created a joint obligation under the policy's intentional acts exclusion applying to the insured innocent parents and insured minor son who committed vandalism); *Trinity Universal Ins. Co. v. Kirsling*, 73 P.3d 102, 105 (Idaho 2003) (holding that an intentional acts exclusion which excluded "any loss" arising out of any act committed by or at the direction of "an insured" and "with the intent to cause a loss" barred coverage); *Woodhouse v. Farmers Union Mut. Ins. Co.*, 785 P.2d 192, 194 (Mont. 1990) (holding "an insured" unambiguously bars coverage to an innocent coinsured); *McAllister v. Millville Mut. Ins. Co.*, 640 A.2d 1283, 1289 (Pa. Super. Ct. 1994) (denying coverage to innocent coinsured when other insured committed arson and policy included an intentional acts provision referring to "an insured" and a neglect exclusion referring to "any insured"); *Dolcy v. R.I. Joint Reins. Ass'n*, 589 A.2d 313, 316 (R.I. 1991)

*Sager* did not disturb this textual construction of company insurance policies. 680 N.W.2d at 11–12. In *Sager,* we found, as a threshold matter, that the language of the insurance policy referring to "an insured" means "an unspecified insured." *Id.* Consequently, "if any insured sets fire to the house, all insureds are barred from recovering." Thus, under the language of the policy, the innocent coinsured was denied coverage. 680 N.W.2d at 12.

Therefore, under our long-standing rule of construing "any insured" in insurance policies as barring recovery to the innocent coinsured spouse, American Family properly denied coverage to Michelle under the intentional loss exclusion.

2. *Severability clause.* Michelle next argues a severability clause in the definitions section of the American Family policy provides her coverage under the policy. This provision states, "Each person described above is a separate insured under this policy." Accordingly, she urges the court to interpret the policy as if Michelle was the only insured. This reading would allow Michelle to recover, because she did not set fire to the house.

We have already considered the question of what effect severability-of-interest clauses have on insurance policy exclusions. The answer—none. We reach this conclusion by first recognizing that " 'the purpose of severability clauses is to spread protection, to the limits of

---

(holding that the policy's intentional loss exclusion referring to "an insured" imposes a joint obligation); *Utah Farm Bureau Ins. Co. v. Crook*, 980 P.2d 685, 688 (Utah 1999) (finding the intentional loss exclusion referring to "an insured" denied coverage to innocent coinsured when the other coinsured burned down the house); *see also Century-Nat'l Ins. Co. v. Garcia*, 51 Cal. 4th 564, 568–69 (2011) (recognizing that statutory language of "any insured" increasing the hazard of loss or concealing fraud refers to joint or collective liability, not several as when the standard policy refers to "the insured").

coverage, among all of the named insureds. The purpose is not to negate bargained-for exclusions which are plainly worded.'" *Corrigan*, 697 N.W.2d at 116–17 (quoting *Nat'l Ins. Underwriters v. Lexington Flying Club, Inc.*, 603 S.W.2d 490, 492 (Ky. Ct. App. 1979)). Here, the policy illustrates this fact because after the severability clause, it states, "This does not increase our limit."

In addition, we found such clauses serve as a conduit by which the insurance company can communicate that, under the policy, the term insured does not always mean "any" insured person, but sometimes, only "the" insured claiming coverage. *See Zenti v. Home Ins. Co.*, 262 N.W.2d 589–92 (Iowa 1978) (finding on first impression that the severability clause was inserted to clarify that only "the insured," namely the employer, was liable under the "bodily injury to any employee" exclusion when the phrase "the insured" was used). Thus, the severability clause serves to reinforce the language differentiating between joint obligations ("any" or "an" insured) and separate obligations ("the" insured).

Moreover, in construing the language of this policy, the severability clause does not create an ambiguity. Throughout the policy, we find "the insured." However, it unambiguously refers to "any insured" in other sections, namely the exclusions provisions. Thus, the severability clause operates to set apart these provisions.

Furthermore, if we construe all references to "any" or "the" insured as a "separate insured," this renders the exclusion's express language imposing joint obligations a nullity. *See IMT Ins. Co. v. Crestmoor Golf Club*, 702 N.W.2d 492, 497 (Iowa 2005) (holding that the severability-of-interest clause does not affect the denial of coverage when a criminal acts exclusion refers to "any insured"); *Corrigan*, 697 N.W.2d at 116–17 (finding that the severability clause did not remove joint obligations

under the criminal acts exclusion referring to "any insured").  Our rule remains consistent with the majority position of other jurisdictions.[7]

3.  *The doctrine of reasonable expectations.*  Michelle makes a doctrine of reasonable expectations argument in her brief.  This doctrine is only used when an exclusion is "(1) bizarre or oppressive, (2) eviscerates terms explicitly agreed to, or (3) eliminates the dominant purpose of the transaction."  *Corrigan,* 697 N.W.2d at 118 (citation and internal quotation marks omitted).  Moreover, the doctrine is " 'carefully circumscribed and does not contemplate the expansion of coverage on a

---

[7]*See EMCASCO Ins. Co. v. Diedrich,* 394 F.3d 1091, 1097–98 (8th Cir. 2005) (imposing joint obligations under South Dakota law for an intentional acts exclusion referring to "one or more insureds," despite the severability clause); *Standard Fire Ins. Co. v. Proctor,* 286 F. Supp. 2d 567, 574–75 (D. Md. 2003) (indicating that "any" is not ambiguous under Maryland law and exclusion is collective, regardless of severability clause); *Allstate Ins. Co. v. Kim,* 121 F. Supp. 2d 1301, 1308 (D. Hawaii 2000) (finding "an insured" is unambiguous, applies to innocent coinsureds, and is not affected by the severability clause); *Chacon,* 788 P.2d at 752 (preferring to give full effect to exclusions referring to "any insured," despite a severability clause, in order to respect the party's contractual expectations and enforce the court's contractual analysis); *Johnson v. Allstate Ins. Co.,* 687 A.2d 642, 644–45 (Me. 1997) (finding severability clauses do not change the collective effect of an intentional acts exclusion referring to "an insured"); *SECURA Supreme Ins. Co. v. M.S.M.,* 755 N.W.2d 320, 328–29 (Minn. Ct. App. 2008) (holding that the severability clause did not make the criminal acts exclusion referring to "any" insured ambiguous); *Am. Family Mut. Ins. Co. v. Copeland-Williams,* 941 S.W.2d 625, 627–29 (Mo. Ct. App. 1997) (holding that "any insured" in the exclusionary clause is unambiguously collective rather than several, despite severability clause); *Villa v. Short,* 947 A.2d 1217, 1224–25 (N.J. 2008) (finding that a severability clause does not inject ambiguity or remove the joint obligation imposed by intentional and criminal acts exclusions referring to either "an insured" or "any insured"); *Safeco Ins. Co. of Am. v. White,* 913 N.E.2d 426, 441–42 (Ohio 2009) (holding that a severability clause does not affect the plain meaning and application of "an insured" or "any insured" in the exclusions denying coverage to innocent coinsureds); *McAllister,* 640 A.2d at 1289 (finding joint obligations under the exclusion even though the policy defined each named insured as a "separate insured"); *Great Cent. Ins. Co. v. Roemmich,* 291 N.W.2d 772, 774–75 (S.D. 1980) (establishing that an exclusion applying to "any insured" is unambiguous and unaffected by a severability clause); *Mut. of Enumclaw Ins. Co. v. Cross,* 10 P.3d 440, 445 (Wash. Ct. App. 2000) (establishing that a severability clause does not affect the meaning of "an insured" as used in an intentional acts exclusion); *J.G. v. Wangard,* 753 N.W.2d 475, 488 (Wis. 2008) (denying coverage to all coinsureds under the intentional acts exclusion referring to "any" insured, despite the severability clause).

general equitable basis.'" *Id.* (quoting *Johnson,* 533 N.W.2d at 206). Instead, it is only relied upon when the insured establishes "that an ordinary layperson would misunderstand the policy coverage or that there are circumstances attributable to the insurer that led the insured to expect coverage." *Id.*

As we found in *Corrigan,* a reasonable person understands the phrase, "an insured," in an exclusion bars coverage to all the insureds. 697 N.W.2d at 108 (citing *Vance,* 457 N.W.2d at 593). Unlike in *Corrigan,* Michelle claims two American Family employees told her they had "recommended the policy be paid." However, those representations occurred *after* the fire, not when the parties entered the insurance contract.

We have only applied the reasonable expectations doctrine to "representations made by the insurer at the time of policy negotiation and issuance." *Vos v. Farm Bureau Life Ins. Co.,* 667 N.W.2d 36, 50 (Iowa 2003); *see also Rodman v. State Farm Mut. Auto. Ins. Co.,* 208 N.W.2d 903, 908 (Iowa 1973). However, we have recognized there may be "other circumstances attributable to the insurer" which could create such expectations. *Rodman,* 208 N.W.2d at 908. A representation made after a loss is not such a circumstance. Thus, Michelle did not have a reasonable expectation that the policy covered this sort of loss, and accordingly, she is not entitled to recover under the reasonable expectations doctrine.

**C. Recovery Under Iowa's Standard Fire Policy.** In *Sager,* we added "a second step to the contractual analysis" when the company's fire insurance policy unambiguously denies coverage to the innocent

coinsured.[8]  680 N.W.2d at 14 (citation and internal quotation marks omitted).  This statute-based theory of recovery requires us to analyze whether the company's policy conflicts with the minimum protection provided in the standard fire policy.  *Id.* at 12.  If the company's policy denies the statutory minimum, the insurance policy is unenforceable, and we must reform it to comply with the statute.  *Id.*

Accordingly, our first inquiry is what "minimum coverage" is required under the standard policy.  When we decided *Sager*, section 515.138 of the 2003 Code of Iowa contained the standard policy's language and requirements.  The standard policy made no reference to "an insured" or "any insured."  Iowa Code § 515.138 (2003).  Instead, it exclusively referred to "the insured" sixteen times.  *Id.*  Thus, in *Sager*, we held the policy required an innocent spouse to be covered.  680 N.W.2d at 15.  We filed *Sager* on May 12, 2004.  *Id.* at 8.

On April 13, 2005, during the next legislative session after we decided *Sager*, House File 854 was introduced in the house of representatives.  H. Journal, 81st G.A., 1st Sess. (Iowa 2005).  House File 854 replaced "the insured" with "an insured" five times in the standard policy—at the places pertaining to the conduct-related exclusions in the standard policy.  H.F. 854, 81st G.A., 1st Sess. (Iowa 2005).  In the explanation, the bill stated, "Code section 515.138 [now section 515.109] revises language about intentional acts in standard fire policy language which are noncompensable."  H.F. 854, 81st G.A., 1st Sess., explanation (Iowa 2005).  Senate File 360 contained the same language regarding the

---

[8]Other states have adopted this same analytical framework.  *See, e.g., Fireman's Fund Ins. Co. v. Dean*, 441 S.E.2d 436, 438 (Ga. Ct. App. 1994); *Osborn v. Nat'l Union Fire Ins. Co.*, 632 So. 2d 1158, 1161 (La. 1994); *Borman v. State Farm Fire & Cas. Co.*, 521 N.W.2d 266, 267–68 (Mich. 1994); *Watson v. United Servs. Auto. Ass'n*, 566 N.W.2d 683, 689 (Minn. 1997).

amendments to section 515.138. S.F. 360, 81st G.A., 1st Sess. (Iowa 2005). On April 19, the house substituted Senate File 360 for House File 854 and passed Senate File 360. H. Journal, 81st G.A., 1st Sess. (Iowa 2005). The amendments in Senate File 360 changing "the insured" to "an insured" eventually passed. 2005 Iowa Acts ch. 70, §§ 19–21 (now codified at Iowa Code § 515.109).

When confronted with the task of statutory interpretation, we have stated:

> The goal of statutory construction is to determine legislative intent. We determine legislative intent from the words chosen by the legislature, not what it should or might have said. Absent a statutory definition or an established meaning in the law, words in the statute are given their ordinary and common meaning by considering the context within which they are used. Under the guise of construction, an interpreting body may not extend, enlarge, or otherwise change the meaning of a statute.

*Auen v. Alcoholic Beverages Div.*, 679 N.W.2d 586, 590 (Iowa 2004) (citations omitted).

We derive legislative intent not only from the language used but also from "the statute's 'subject matter, the object sought to be accomplished, the purpose to be served, underlying policies, remedies provided, and the consequences of the various interpretations.' " *Cox v. State*, 686 N.W.2d 209, 213 (Iowa 2004) (quoting *State v. Albrecht*, 657 N.W.2d 474, 479 (Iowa 2003)). The legislative history of a statute is also instructive in determining legislative intent. *State v. Allen*, 708 N.W.2d 361, 366 (Iowa 2006); *Richards v. Iowa Dep't of Revenue*, 362 N.W.2d 486, 488 (Iowa 1985). Additionally, we give weight to explanations attached to a bill. *City of Cedar Rapids v. James Props., Inc.*, 701 N.W.2d 673, 677 (Iowa 2005). Finally, when the legislature amends a statute, it

raises a presumption that the legislature intended a change in the law. *Id.*

It is clear from the timing of the amendments and the explanation of the bill that the legislature intended to amend section 515.109, narrow the intentional acts that are compensable under the standard policy, and overrule our holding in *Sager*, where we held the standard policy provided coverage to the innocent spouse. Thus, the amendments returned the law to as it existed prior to our decision in *Sager*. Consequently, American Family properly denied coverage to Michelle under the intentional loss exclusion.

## V. Disposition.

We affirm the judgment of the district court because we find substantial evidence supports the district court finding that the coinsured, David Postell, who set fire to the insured dwelling in order to commit suicide, had the requisite intent to cause a loss under the policy; that under the language of the policy, the innocent coinsured spouse, who did not participate in the intentional acts of the other coinsured, cannot recover due to the intentional loss exclusion; and that an innocent coinsured cannot recover under the recently amended Iowa standard fire policy in Iowa Code section 515.109.

**AFFIRMED.**