# IN THE COURT OF APPEALS OF IOWA

No. 14-1297
Filed July 22, 2015

**GENE LARIVIERE,**
    Plaintiff-Appellant,

**vs.**

**SURGICAL SERVICES, P.C.,**
    **Defendant-Appellee.**
_____

Appeal from the Iowa District Court for Johnson County, Paul D. Miller,

Judge.

A surgeon appeals the district court's dismissal of his breach-of-contract

lawsuit against his former employer.  **AFFIRMED**.

Charles T. Traw of Leff Law Firm, L.L.P., Iowa City, for appellant.

Allison Werner Smith of Hayek, Brown, Moreland & Smith, L.L.P., Iowa

City, for appellee.

Considered by Tabor, P.J., McDonald, J., and Eisenhauer, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2015).

**TABOR, P.J.**

Dr. Gene Lariviere was a shareholder and employee of Surgical Services, P.C. until he voluntarily terminated his employment as provided in their employment agreement. When Surgical Services did not pay him deferred compensation, Dr. Lariviere sued for breach of contract. The district court decided voluntary termination was not an event which entitled Dr. Lariviere to deferred compensation. Dr. Lariviere appeals that decision. Because the language of the employment agreement cannot reasonably be interpreted to require deferred compensation in cases of voluntary termination, we affirm the holding of the district court in favor of Surgical Services.

## I.   Background Facts and Proceedings

Dr. Lariviere, a general surgeon, began work at Surgical Services as a non-owner employee in 1996. In July 1997 the corporation offered him the opportunity to become a shareholder. Surgical Services paid quarterly bonuses to its shareholders based on the revenue they generated. Surgical Services reduced the bonuses paid to Dr. Lariviere as a new shareholder by seventy percent of the accounts receivable he generated as a non-owner employee that remained uncollected at the date he became a shareholder. This practice was explained to Dr. Lariviere by Surgical Services's business consultant and accountant, Tony Clark. Dr. Lariviere testified that Clark justified this practice of reducing initial bonuses by explaining that Dr. Lariviere would be entitled to ninety-five percent of his accounts receivable outstanding when he left Surgical Services. Clark further led Dr. Lariviere to believe deferred compensation would

only be denied if his employment was terminated due to loss of his medical license or failure to substantially perform. Clark testified that his explanation to Dr. Lariviere was regarding the general industry practice of bonus reduction "buy-in" and deferred compensation "buy-out"—not the actual employment agreement between the parties.

A written employment agreement was not presented to Dr. Lariviere until December 1997, but the agreement's stated effective date was July 1, 1997. Thomas Gelman, Surgical Services's attorney, prepared the employment agreement. The contract included an integration clause which stated "[N]o amendment or variation of the terms of this Agreement shall be valid unless made in writing and signed by the Employee and a duly authorized representative of the Employer." Paragraph 4 of the employment agreement contains the language at issue on appeal:

> 4. <u>TERMINATION</u>. This Agreement shall terminate upon the happening of any of the following events:
> (a)    Whenever the employee shall cease to be licensed to practice medicine in the State of Iowa;
> (b)    Whenever Employer and Employee shall mutually agree to termination in writing;
> (c)    Upon the death of Employee;
> (d)    Whenever the Employee incurs an illness or disability which prevents the Employee from rendering the usual and normal services to the Employer as contemplated herein . . . ;
> (e)    If there is a substantial failure on the part of the Employee to perform the duties anticipated hereunder . . . ;
> (f)    As of the end of the Employer's fiscal year in which the Employee attains the normal retirement age . . . ;
> (g)    Notwithstanding any of the provisions of subparagraphs (a) through (f) above, *upon ninety (90) days prior written notice given by the Employee to the Employer.*
>     Upon termination for any of the foregoing causes, the Employee shall be entitled to receive any and all vacation benefits and compensation accrued but unpaid as of the date of termination.

> Additionally, as deferred compensation, the Corporation shall pay to Employee in the event of termination of employment on account of death, disability, retirement or *termination by the Corporation without cause under 4(g)* (but not in the event of termination of employment under 4(a) and 4(e)) 95% of Employee's accounts receivable at the close of business on the date of termination that may be collected during the succeeding twelve months.

(Emphasis added.) This paragraph contains an inconsistency: the language detailing the situations in which Surgical Services would pay deferred compensation includes "termination by the Corporation without cause under 4(g)" but subparagraph (g) does not contain a provision allowing termination without cause by Surgical Services. At trial, attorney Gelman explained the inconsistency was his error—he mistakenly believed subparagraph (g) allowed Surgical Services to terminate the agreement without cause, as their previous employment agreement had allowed. Gelman testified he "particularly wanted to protect a terminated employee who had been terminated without cause by the company to make sure that that individual would, in fact, receive his or her deferred compensation." Before adoption of the agreement, Gelman sent a letter to Dr. Richard Hockmuth, then the sole owner of Surgical Services, to confirm that the agreement embodied the intent of Surgical Services:

> I have tried to incorporate your past practice at the last paragraph of Section 4 of the Employment Agreement. This provides that a shareholder who retires, dies or whose employment is terminated as a result of disability or by the shareholders without cause, that shareholder will receive payment of 95% of accounts receivable at the close of business on the date of termination collected during the succeeding twelve months, as collected.

Dr. Lariviere testified that he reviewed the employment agreement but did not seek legal advice before signing it.

Dr. Darwin Peterson became a shareholder of Surgical Services in 2003; his employment agreement contained the same language regarding deferred compensation as Dr. Lariviere's employment agreement. Dr. Peterson testified that at the time of executing the agreement, after speaking with Clark and Dr. Lariviere, his understanding was that the only means of termination which would preclude deferred compensation were failure to perform or loss of medical license. Dr. Peterson voluntarily resigned his position in November 2008. Before Dr. Peterson left Surgical Services, three doctors had retired from Surgical Services and had each received deferred compensation. In early 2009, Surgical Services's office manager, at Clark's direction and in accordance with prior practice, began making deferred compensation payments to Dr. Peterson.

Dr. Lariviere gave his ninety-day notice of voluntary termination under subparagraph 4(g) of his employment agreement in March 2009 and left Surgical Services in June. Dr. Lariviere did not retire; rather, he began working as a surgeon at a competing hospital.

Meanwhile, in May of 2009, after Dr. Lariviere gave notice but before he left the corporation, the remaining Surgical Services shareholders learned that Dr. Peterson was receiving deferred compensation. They immediately contacted attorney Gelman to determine if Dr. Peterson was entitled to the payments. Gelman confirmed the employment agreement did not provide for deferred compensation when a shareholder left Surgical Services voluntarily. The shareholders discontinued the payments, requested that Dr. Peterson return any overpayments made to him, and fired Clark.

After leaving Surgical Services, Dr. Lariviere continued to receive financial data from Surgical Services, which alerted him that Dr. Peterson had received deferred compensation. Dr. Lariviere believed that he too should have received deferred compensation payments following his voluntary termination. Surgical Services maintained that Dr. Lariviere's employment agreement did not provide for deferred compensation in the event of voluntary termination and explained that the payments to Dr. Peterson were a mistake made by the now-fired business consultant Clark.

In August 2010, Dr. Lariviere filed a petition alleging Surgical Services breached his employment agreement by failing to pay him deferred compensation. Surgical Services answered by denying the claim of breach because the agreement did not call for deferred compensation in cases of voluntary termination by the employee. After repeated postponements, the district court held a one-day bench trial on March 26, 2014. Deeming Surgical Services's interpretation of the employment agreement the "most reasonable of the two alternatives," the court found the "plain reading of [paragraph 4] requires deferred compensation payments by [Surgical Services] only upon death, disability, retirement . . . or termination of the employee's service by the corporation without cause." In the alternative, the court held:

> Additionally, if this paragraph is so ambiguous that extrinsic evidence may be considered, I find credible and convincing the testimony of attorney Tom Gellman that the intent of the parties was to pay deferred compensation only in the event of death, disability, retirement or termination by the corporation without cause.

Accordingly, the court ruled on July 8, 2014, that—because Dr. Lariviere's termination was voluntary—Surgical Services did not breach the employment agreement by denying him deferred compensation. Dr. Lariviere filed a timely notice of appeal on August 6, 2014.

## II. Scope and Standards of Review

Contract interpretation is the process of determining the meaning of the words of a contract, while contract construction is the process of determining the legal effect of those words. *Pillsbury Co. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 435 (Iowa 2008). We review a district court's interpretation of a contract for errors at law unless extrinsic evidence was used to aid in the interpretation of the contract. *Postell v. Am. Family Mut. Ins. Co.*, 823 N.W.2d 35, 41 (Iowa 2012). When a district court reaches its interpretation based upon extrinsic evidence, the court's factual findings regarding the extrinsic evidence are binding if supported by substantial evidence. *Id.* We always review a district court's construction of a contract for errors at law. *Id.*

## III. Analysis

Determining the intent of the parties at the time they executed the agreement is the primary goal of contract interpretation. *Walsh v. Nelson*, 622 N.W.2d 499, 503 (Iowa 2001). The words of the contract are the most important evidence of the parties' intentions. *Pillsbury Co.*, 752 N.W.2d at 436; *see* Iowa R. App. P. 6.903(3)(n) ("[T]he intent of the parties must control, and except in cases of ambiguity, this is determined by what the contract itself says."). The Iowa Supreme Court has provided a two-step analysis for interpreting a contract:

> First, from the words chosen, a court must determine what meanings are reasonably possible. In so doing, the court determines whether a disputed term is ambiguous. A term is not ambiguous merely because the parties disagree about its meaning. A term is ambiguous if, after all pertinent rules of interpretation have been considered, a genuine uncertainty exists concerning which of two reasonable interpretations is proper. Once an ambiguity is identified, the court must then choose among possible meanings.

*Walsh*, 622 N.W.2d at 503. Regardless of the presence of ambiguity, the agreement is to be interpreted in light of all the circumstances surrounding the formation of the contract. *Fausel v. JRJ Enters. Inc.*, 603 N.W.2d 612, 618 (Iowa 1999).

Following the list of possible means of termination, paragraph 4 of the employment agreement addresses two distinct forms of post-termination compensation. The first form is inclusive, stating that the employee would receive any vacation benefits and compensation accrued but unpaid at the time of termination "[u]pon termination for any of the foregoing causes." These benefits are not the subject of this appeal.

Unlike the benefits described in the preceding sentence, the deferred compensation discussed in the second sentence is subject to a condition precedent. "Conditions precedent 'are those facts and events, occurring subsequently to the making of a valid contract, that must exist or occur before there is a right to immediate performance, before there is a breach of contract duty, before the usual judicial remedies are available.'" *Nat'l Farmers Org. Inc. v. Lias*, 271 N.W.2d 751, 754 (Iowa 1978) (quoting 3A Corbin on Contracts § 628 (1960)). Conditional language ("in the event of") separates Surgical Services's

potential performance obligation (payment of deferred compensation) from the condition which must occur before that obligation is due (one of the four enumerated methods of employment termination). The sentence describes a performance obligation of Surgical Services which will only come due upon the occurrence of one of four conditions precedent: "termination of employment on account of death, disability, retirement or termination by the Corporation without cause under 4(g)." Because voluntary termination by the employee is not one of the four conditions, Surgical Services did not breach the contract by refusing to pay deferred compensation to Dr. Lariviere.

On appeal Dr. Lariviere contends the language of paragraph 4 required Surgical Services to pay deferred compensation in the event of voluntary termination by the employee. This interpretation rests on the interplay between the language "termination by the Corporation *under 4(g)*" and the fact that 4(g) is the subparagraph which granted Dr. Lariviere the right to voluntarily terminate the agreement.

Dr. Lariviere argues that the district court "failed to consider the meaning or impact of the language 'under 4(g)'" and that by failing to do so the court "discarded the language as mere surplusage." We disagree with Dr. Lariviere's argument, though we acknowledge that an "interpretation that gives a reasonable, lawful, and effective meaning to all terms is preferred to an interpretation that leaves a portion of the agreement of no effect." *See Smith Barney, Inc. v. Keeney*, 570 N.W.2d 75, 78 (Iowa 1997). When read in context, the prepositional phrase "under 4(g)" does not add another means to satisfy the

condition. The phrase references (albeit inaccurately) the corporation's right to terminate without cause under 4(g). This drafting mistake does not create an ambiguity that allows a reasonable reader to conclude voluntary termination by the employee satisfies one of the enumerated conditions which oblige Surgical Services to pay deferred compensation. The interpretation urged by Dr. Lariviere does not give reasonable, lawful, and effective meaning to the phrase "termination by the Corporation without cause under 4(g)."

Dr. Lariviere further argues that because the contract was drafted by Surgical Services's attorney it should be construed strictly against Surgical Services. "[W]hen there are ambiguities in a contract, they are strictly construed against the drafter." *Iowa Fuel & Minerals, Inc. v. Iowa State Bd. Of Regents*, 471 N.W.2d 859, 863 (Iowa 1991). A term is ambiguous if it is "fairly susceptible to two interpretations." *Id*. The fact that Dr. Lariviere disagrees with Surgical Services's interpretation of the deferred compensation provision does not make it ambiguous. *See Walsh*, 622 N.W.2d at 503 ("A term is not ambiguous merely because the parties disagree about its meaning.").

Despite the absence of ambiguity, we must determine the intent of the parties in light of all the circumstances. *See Fausel*, 603 N.W.2d at 618 ("[T]he rule that words and other conduct are interpreted in the light of all the circumstances is not limited to cases when ambiguity in the agreement exists."). We agree with the district court's finding that the clause in contention was a drafting mistake which did not impact Dr. Lariviere's right to deferred compensation. We are bound by this finding because it was supported by

substantial evidence—the testimony of attorney Gelman and the letter to Surgical Services confirming the intent to limit deferred compensation to cases of death, retirement, disability or termination by the shareholders without cause. The fact that a business consultant for Surgical Services told Dr. Lariviere that he would receive deferred compensation upon leaving Surgical Services is of little import, as are the erroneous and quickly rectified payments to Dr. Peterson made at the request of the same consultant. Considering the unambiguous language of the contract which he read and signed, Dr. Lariviere cannot successfully contend his intent differed from that of the writing. *See Cronbaugh v. Farmland Mut. Ins. Co.*, 475 N.W.2d 652, 654 (Iowa Ct. App. 1991) ("Where a party to a written contract is able to and has had the opportunity to read the contract, he or she cannot claim later in an attempt to defeat the contract that he or she did not understand the contract terms or conditions.").

## IV.   Conclusion

We agree with the district court's conclusion that the plain language of the contract did not require Surgical Services to pay Dr. Lariviere deferred compensation after he voluntarily terminated his employment. Because the agreement contained no such performance obligation, there was no breach. Accordingly, we affirm the district court's ruling in favor of Surgical Services.

**AFFIRMED.**