# IN THE COURT OF APPEALS OF IOWA

No. 14-0769
Filed December 23, 2015

**T. ZENON PHARMACEUTICALS, LLC,**
**(d/b/a PHARMACY MATTERS),**
 Plaintiff/Counterclaim Defendant-Appellant,

**vs.**

**WELLMARK, INC.,**
 Defendant/Counterclaimant-Appellee,

and

**WELLMARK HEALTH PLAN OF IOWA, INC.,**
 Intervenor/Counterclaimant-Appellee.

_____

Appeal from the Iowa District Court for Johnson County, Paul D. Miller, Judge.

A pharmacy appeals the district court's decision that it breached anti-assignment clauses and failed to provide "covered services" under its contracts with a health insurance company. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Richard C. Garberson and Kerry A. Finley of Shuttleworth & Ingersoll, P.L.C., Cedar Rapids, and Anthony Paduano and Jason Snyder of Paduano & Weintraub, L.L.P., New York, New York, for appellant.

John F. Lorentzen of Nyemaster Good, P.C., Des Moines, and Sarah J. Gayer and Kevin H. Collins of Nyemaster Goode, P.C., Cedar Rapids, for appellees.

Heard by Potterfield, P.J., and Doyle and Tabor, JJ.

**TABOR, Judge**.

This case involves a contract dispute between an Iowa City pharmacy and a mutual insurance company, Wellmark, Inc.[1] The pharmacy, T. Zenon Pharmaceuticals (doing business as Pharmacy Matters), sued Wellmark after the insurance company declined to pay claims exceeding $7 million for injectable drugs prescribed for hemophilia patients. Wellmark (along with intervenor Wellmark Health Plan of Iowa, Inc. (WHPI))[2] counterclaimed, alleging Pharmacy Matters breached their contracts. After a lengthy trial, the district court decided Pharmacy Matters materially breached the anti-assignment clauses in the contracts or, alternatively, did not provide "covered services" to the patients.

On appeal, Pharmacy Matters contends it fulfilled its contractual obligation to provide "covered services" by "dispensing" the injectable drugs to the patients. The pharmacy also contends Wellmark breached the entity contracts by not paying claims submitted for 118 shipments of injectable drugs. We agree Pharmacy Matters provided "covered services" when its pharmacist, Michael Stein, filled 114 prescriptions for injectable drugs from his location in Iowa City, but we find Stein did not provide "covered services" for four shipments that did not physically pass through Iowa. We also find no support for the district court's conclusion Pharmacy Matters violated the anti-assignment clauses. Accordingly, we affirm in part, reverse in part, and remand for a determination, consistent with this opinion, of damages owed to Pharmacy Matters.

---

[1] Wellmark is an Iowa health insurance company and independent licensee of the Blue Cross Blue Shield Association (BCBSA).

[2] WHPI is licensed by the Iowa Division of Insurance as a health maintenance organization (HMO). We will refer to WHPI and Wellmark collectively as Wellmark.

## I.      Background Facts and Proceedings

At the heart of this case are twenty-four patients, mostly children, who require Factor drugs to treat the rare, inherited disease of hemophilia. Hemophilia impairs the body's natural ability to control blood clotting due to the patient's lack of sufficient proteins to stop bleeding quickly. Hemophilia patients require infusions of a blood-clotting factor to prevent a possibly fatal bleed. Factor drugs have variable concentration levels attuned to each patient. These drugs, which are often delivered directly to the patient's home from a specialty pharmacy, are expensive. The cost for one year's supply of the Factor drugs may exceed $1 million per patient. The patients often require coordinated care and use disease-management companies to assist with their needs.

The twenty-four patients in this case were all insured by health plans administered by a BCBSA licensee. The patients also were clients of Factor Health Management (FHM), a disease-management company and pharmaceutical wholesaler based in Florida. The company focused on coordinating care for patients with hemophilia across the country. As part of its coordination of care, FHM owned FCS Pharmacy, a Florida-licensed pharmacy that also possessed a non-resident pharmacy license in Iowa. Because of the high cost of the Factor drugs, it is critical for the patients to use a pharmacy that accepts their insurance, while delivering the drugs in a timely fashion.

In June 2008, FHM began working with A.K., a patient living in Iowa who was covered by the hawk-i program (Healthy and Well Kids in Iowa). A.K., who was then five years old, received treatment at the University of Iowa Hospitals

Hemophilia Treatment Center when his parents were unable to find a vein necessary for infusing his Factor drugs. The drugs were covered under the hawk-i program only if obtained from a provider within Wellmark's network of providers. After an online search for home-infusion therapy providers within the network, FHM found Pharmacy Matters in Iowa City.

Pharmacy Matters has been an Iowa-licensed pharmacy since 2006. The owner, Stein, has been a pharmacist since 1990 and is the only full-time pharmacist at Pharmacy Matters. In 2007, Pharmacy Matters entered into contracts with Wellmark and WHPI to offer home infusion therapy as an in-network provider. According to Wellmark's Home Infusion Therapy (HIT) Guide, home infusion providers are "licensed pharmacies that provide a wide range of services required to administer home infusion . . . and specialty drugs." The guide sets out services that are billed per diem and medications that are excluded from per diem billing.

In July 2008, FHM entered into a "contract pharmacy agreement" with Pharmacy Matters to deliver the Factor drugs to A.K. and other patients around the country. Under the contract, the designated patients remained as customers of FHM, but also became customers of Pharmacy Matters once it dispensed the Factor drugs to them. FHM wanted an agreement with Pharmacy Matters because the pharmacy was an in-network BCBSA provider, which would enable the patients to receive a more favorable reimbursement rate.

With the contracts signed, the process for distributing the Factor drugs generally followed these steps. Coordinating with the patients and their doctors,

FCS would obtain Factor from FHM and assemble the patient-specific dosages in compliance with the prescription. FCS would apply a patient-specific label containing instructions for how the patients or their caregivers should administer the drugs. FCS would then package the Factor, which required assembling vials in baggies and including freezer packs for temperature control. The package also included the necessary equipment to inject the drugs. FCS would prepare a delivery ticket and generate other necessary documents. FCS would send Pharmacy Matters a delivery ticket and prescription form by facsimile to notify it of an incoming Factor shipment. FCS also provided Pharmacy Matters with shipping labels to facilitate delivery of the Factor to the patients.

Stein testified Pharmacy Matters received the Factor drugs from the Florida wholesaler in a large box with room for foam coolers and ice packs. Stein ensured the drugs were stored properly if he could not process the order right away. Stein had the patient's prescription in his possession before the drug shipment went out. When Stein was ready to process an order, he would examine the pre-made labels and prescription to ensure the packages contained the right product. Stein would identify the National Drug Code (NDC)[3] number and compare it to the label to verify it matched. Stein then affixed his Pharmacy Matters label and performed the "prospective drug utilization review." He also included a patient advisory leaflet with the drugs before repackaging them for shipment, usually by Federal Express. Then Pharmacy Matters would seek

---

[3] Under the Drug Listing Act of 1972, all drugs prepared for commercial distribution are identified and reported using a unique number called the National Drug Code, which serves as a universal product identifier. *See* www.fda.gov (last visited November 24, 2015).

reimbursement from Wellmark. Under the contract between Pharmacy Matters and FHM, Pharmacy Matters agreed to pay FHM 98.5% of the reimbursement it received from Wellmark.

In October 2008, Wellmark began investigating Pharmacy Matters after the insurance company noticed the pharmacy submitting claims for a large volume of expensive Factor drugs. BCBSA senior anti-fraud consultant Calvin Sneed contacted Richard Jensen, Wellmark's special investigation unit team leader, about the increase in Factor claims. Jensen assigned senior investigator Debra Robles to investigate Pharmacy Matters.[4]

Robles had an initial meeting with Stein in November 2008. Stein told Robles that he was referred twelve to fifteen new hemophilia patients from FHM. Although Wellmark decided to deny the claims for those patients while its investigation progressed, Robles advised Stein to continue submitting claims.

Over the course of its investigation, Wellmark shifted among different grounds for rejecting Pharmacy Matters' claims. For instance, an email sent by Sneed in early December 2008 to Jensen, Robles, and others, advised:

> Wellmark may deny claims up front in appropriate circumstances, either for records on new claims, or for not having a valid prescription (if missing from the records provided). With a valid prescription, or once a valid prescription is supplied to Wellmark, [it] may still deny for records—in effect, deferring to each of you to determine whether the claim should be paid.

---

[4] The insurer's investigation was not limited to Pharmacy Matters; it initially focused on FHM's nationwide presence. Robles advised Stein the insurance company had been "chasing these folks for a number of years." Robles said Wellmark did not want Stein to be "a target of our investigation but a cooperative witness" against FHM.

Robles replied to Sneed that Wellmark's pharmacy director, medical director, and medical policy team were "going to try to put a medical policy in place that is going to make it difficult for them to use Pharmacy Matters and if they do [use Pharmacy Matters] to limit the amount of [the F]actor they can send."

In late December 2008, Robles emailed Alanna Lavelle, an investigator for the Georgia BCBSA licensee, explaining Wellmark's "strategy" was to deny new claims for "documentation" or for not having a valid prescription. For those claims that Wellmark received documentation and prescriptions, Wellmark's pharmacy director Mathew Hosford performed a review to "determine what is the maximum amount of [the] Factor that the member should receive in a month. If the member is receiving more than that amount then we are going to deny whatever is over as provider liability." Robles again mentioned "putting a medical policy in place that will restrict the Factor somehow to try and get a handle on this situation." Robles concluded the email: "I would like to adjust these claims accordingly unless you can think of another reason that the claim can be denied as I am out of reasons."

In April 2009, Robles took two investigators from the Food and Drug Administration to the home of A.K.'s parents in southeast Iowa. Robles had asked to see A.K.'s infusion logs and, although the parents agreed to send them to her, she insisted on coming to their home in person. During the three-hour visit, the parents accounted for every shipment of infusion drugs they had received. Robles viewed A.K.'s father as "a bit hostile" regarding her inquiries.

At the end of the visit, Robles told the parents they were "getting really close" to their lifetime cap of $1 million on their HIT coverage because of the amount they were being charged by their current provider.[5]  Robles suggested they change to a specialty pharmacy called Caremark, stating Caremark had better rates. Robles left A.K.'s parents with an application for Caremark coverage.  In an email exchange with Robles two weeks earlier, Wellmark Pharmacy director Hosford said, "[I]f you can get them to move to [C]aremark willingly I would definitely owe you lunch!!"

Although Stein, as a pharmacist, did not have access to the medical records of his new customers with hemophilia, he arranged through FHM for the patient's records to be provided to Wellmark.  After Wellmark received the medical records, the insurer searched for a new basis to deny the Factor claims. The insurer's conundrum was captured in the following June 2009 email sent to Robles from Jamie Hanson, an investigator for BCBS licensee Care First:

> I received an inquiry on some of our claims from [P]harmacy [M]atters.  Currently the claims have been rejected for medical records.  Since we have those records, is there another rejection we should be using based on your provider contract?  I will hold them off as long as I can.  I have a meeting with our attorneys today to discuss our litigation strategy.

Between August 2008 and July 2009, Pharmacy Matters billed Wellmark for 118 shipments of Factor drugs to the twenty-four patients in eleven states. Four of the 118 shipments were sent directly from FCS because the patients urgently needed the medication.  After Pharmacy Matters filed its lawsuit,

---

[5] A.K.'s father testified it was not true that their son was close to the lifetime cap, having used only about ten percent of the limit.

Wellmark denied all of the claims. According to Robles, Wellmark denied the claims because the service Stein provided was not covered.

Pharmacy Matters filed its petition against Wellmark on May 1, 2009, alleging breach of contract, unjust enrichment, and bad faith. On September 11, 2009, WHPI filed a motion to intervene, an answer, and counterclaims. Wellmark filed an amended answer and counterclaims as well. The district court granted WHPI's motion to intervene. The counterclaims alleged Pharmacy Matters breached the contract by delegating its duties in violation of the anti-assignment clauses. Wellmark also claimed Pharmacy Matters did not provided "covered services" as defined in the contracts.

The parties filed stipulated facts in November 2012. An eighteen-day bench trial began on November 13, 2012, and concluded on December 13, 2012. The parties filed proposed findings of facts and conclusions of law. On April 25, 2014, the district court issued its ruling. Relevant to this appeal, the court concluded Pharmacy Matters breached its contract with Wellmark by delegating its duties to FCS. In the alternative, the district court found Pharmacy Matters did not provide "covered services" as defined under the contracts. The court denied the claims brought by Pharmacy Matters. The pharmacy now appeals.

## II. Scope and Standards of Review

We review a breach-of-contract claim tried at law to the district court for correction of errors at law. *NevadaCare, Inc. v. Dep't of Human Servs.*, 783 N.W.2d 459, 465 (Iowa 2010). The district court's factual findings have the effect of a special verdict and are binding on us if supported by substantial evidence.

*Id.* But the district court's legal conclusions and application of legal principles are not binding on us. *Id.*

In this case, as in *NevadaCare*, the appellant asks that we apply a more exacting standard of review because the district court's ruling adopted many of the appellees' proposed factual findings and legal conclusions verbatim. Our supreme court has recognized "counsels' submission of proposed findings of fact and conclusions of law can be extremely valuable in assisting the district court, especially in highly technical or complicated cases." *See id.* In *NevadaCare*, our supreme court discouraged the practice of adopting the prevailing party's language word-for-word and emphasized the "district court's duty to independently determine the facts, articulate the controlling law, and apply the controlling law to the facts." *Id.* at 465–66; *see Rubes v. Mega Life & Health Ins. Co.*, 642 N.W.2d 263, 266 (Iowa 2002) ("[T]he customary deference accorded trial courts cannot fairly be applied when the decision on review reflects the findings of the prevailing litigant rather than the court's own scrutiny of the evidence and articulation of controlling legal principles.").

As Pharmacy Matters asserts, the district court's ruling consistently borrows verbatim passages from Wellmark's proposed findings of fact and conclusions of law. In particular, the district court's analysis of the contract's anti-assignment language reflects Wellmark's proposed ruling nearly word-for-word across several pages. Due to the court's heavy reliance on Wellmark's proposed analysis, we will scrutinize the record "more closely and carefully" as we perform our appellate review. *See NevadaCare*, 783 N.W.2d at 465.

In setting out the standard of review, Wellmark contends we are limited to assessing whether the district court's ruling was based on substantial evidence. *See Walsh v. Nelson*, 622 N.W.2d 499, 502–03 (Iowa 2001). Wellmark argues the district court decided Pharmacy Matters did not prove its performance under the HIT contracts, based on many factual findings, and contends we cannot reverse the decision concerning lack of performance unless the evidence offered by Pharmacy Matters was so overwhelming the only reasonable inference was Pharmacy Matters did provide "covered services" under the contract.

Wellmark is correct that the question of performance or breach is generally within the province of the fact finder. *See Iowa-Illinois Gas & Elec. Co. v. Black & Veatch*, 497 N.W.2d 821, 825 (Iowa 1993). But we may inquire into whether the district court's ultimate conclusions were materially affected by improper conclusions of law. *See Fausel v. JRJ Enter., Inc.*, 603 N.W.2d 612, 617 (Iowa 1999).

The district court's decision rested on its interpretation and construction of the contract. In lay terms, "interpret" and "construe" are synonyms. But in resolving contract disputes, our courts have identified "a distinct technical significance" between interpretation and construction. *See Connie's Constr. Co., Inc. v. Fireman's Fund Ins. Co.,* 227 N.W.2d 207, 210 (Iowa 1975). Contract *interpretation* is the process of determining the meaning of the words of a contract, while contract *construction* is the process of determining the legal effect of those words. *Pillsbury Co. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 435 (Iowa 2008). We review a district court's interpretation of a contract for errors at law

unless the court used extrinsic evidence to aid in its interpretation of the contract. *Postell v. Am. Family Mut. Ins. Co.*, 823 N.W.2d 35, 41 (Iowa 2012). When a district court reaches its interpretation based upon extrinsic evidence, the court's factual findings regarding the extrinsic evidence are binding if supported by substantial evidence. *Id.* In contrast, we review a district court's construction of a contract for errors at law. *Id.*

In this case, the district court considered extrinsic evidence in its efforts to interpret the phrase "health care services," which appears in the contract's definition of "covered services" and to interpret the phrase "rights, duties or obligations," which appears in the anti-assignment clause. We are bound by the district court's findings of fact in regard to that extrinsic evidence, recognizing in this matter tried to the court that the trial judge makes credibility determinations and settles factual disputes. But the district court's ultimate construction of the contract—applying those factual findings—is a legal conclusion, which as an appellate court we review for correction of errors at law.

As a final matter in pinpointing our standard of review, we consider the contention by Pharmacy Matters that its agreement with Wellmark was a contract of adhesion to be strictly construed against the drafter. *See State Farm Auto. Ins. Co. v. Malcolm*, 259 N.W.2d 833, 836 (Iowa 1977) ("An insurance policy is a contract of adhesion and therefore its provisions will be construed in a light most favorable to the insured."). A contract of adhesion is "a standard-form contract prepared by one party, to be signed by another party in a weaker position, usually a consumer, who adheres to the contract with little choice about the

terms." *Black's Law Dictionary* 390 (10th ed. 2014). The record leaves no doubt that Wellmark prepared the provider contract and presented it to Pharmacy Matters on a "take-it-or-leave-it basis." *See generally Mueller v. Wellmark, Inc.*, 818 N.W.2d 244, 248 (Iowa 2012). Pharmacy Matters had no bargaining power.

The American Law Institute explained the rationale behind this rule of contract construction:

> Where one party chooses the terms of a contract, he is likely to provide more carefully for the protection of his own interests than for those of the other party. He is also more likely than the other party to have reason to know of uncertainties of meaning. Indeed, he may leave meaning deliberately obscure, intending to decide at a later date what meaning to assert. In cases of doubt, therefore, so long as other factors are not decisive, there is substantial reason for preferring the meaning of the other party. The rule is often invoked in cases of standardized contracts and in cases where the drafting party has the stronger bargaining position, but it is not limited to such cases.

Restatement (Second) of Contracts § 206 cmt. a (1981).

In response, Wellmark points to a clause in its contract that purports to negate this rule of construction. The clause states the contracts "shall not be construed more strongly against any party regardless of who was more responsible for its preparation." At least one other appellate court has held that enforcing a contract clause negating the protection for the non-drafting party would be "unconscionable." *See Concept Rehab, Inc. v. Short*, No. F-96-019, 1997 WL 103820, at *3 (Ohio Ct. App. Mar. 7, 1997). In our case, because we find no ambiguity in the contract terms at issue, we do not believe it is necessary to decide if such a clause may be enforced in Iowa.

**III.  Analysis of Contract Claims**

The parties' contract dispute turns on a pair of questions, which are essentially two sides of the same coin.  First, did Pharmacy Matters provide "covered services" under the entity agreements with Wellmark?  Second, did Pharmacy Matters breach the anti-assignment provision of the agreement by *delegating* the duty of providing "covered services" to FCS/FHM?  To frame these questions, we first look to the language of the contracts.

***Covered Services.***  Under its entity agreement with Wellmark, Pharmacy Matters agreed to "provide Covered Services in accordance with the terms of this Agreement" to participants or beneficiaries of health plans administered by BCBSA licensees.  The agreement defined "Covered Services" as "health care services or supplies to which a Member is entitled pursuant to a Benefit Contract."[6]  In turn, Wellmark agreed to "make payment to Provider in accordance with the terms and conditions of the applicable provisions of Exhibit A."  Exhibit A to the Wellmark Entity Agreement defined "Provider" as including "a home infusion therapy provider."  Exhibit A stated, "For claims incurred, Provider will be paid for Covered Services," including injectable drugs and specialty drugs.

***No Assignment.***  The entity agreement's anti-assignment clause states: "No assignment of the rights, duties or obligations of this Agreement shall be made by Wellmark or Provider without the consent of Provider or Wellmark, respectively."  Similarly, the entity HMO agreement stated: "No assignment of the

---

[6] One example of a member benefit contract included in the record was A.K.'s coverage under the hawk-i program.  That contract's glossary of terms defined "covered services" as "those medically necessary procedures, services, or supplies listed in this policy in section 1: Benefits."  That section listed home infusion therapy as a covered benefit.

rights, duties or obligations of this Agreement shall be made by HMO or Provider without the consent of Provider or HMO, respectively."

Having set out the contract provisions at issue, we next review the district court's interpretation of the terms and its construction of the agreements.

### A. Did Pharmacy Matters Provide Covered Services?

The district court decided Pharmacy Matters was not entitled to recover for breach of contract because it did not provide "covered services" to any of the twenty-four patients who were beneficiaries of health care plans administered by BCBSA licensees. The district court first focused on the term "provide"—which was not defined in the entity agreements. The court noted testimony from Michael Fay, Wellmark vice president of health networks, explaining the term "provide" was not defined "[b]ecause depending on the type of entity that's contracting with Wellmark, the range of services that they could offer or perform is very broad. So we don't define 'provide' inside the contract because it covers a wide range of provider types."

In the absence of a definition in the contract, the district court accepted Wellmark's contention that the "the parties clearly intended 'provide' to mean to perform or supply rather than to simply make available."[7] Using that definition, the court concluded Pharmacy Matters did not provide "covered services" because it "delegated/outsourced all duties that would be associated with dispensing [the] Factor drugs and performing health care services, essentially

---

[7] Wellmark's proposed ruling cited on-line dictionaries that defined "provide" as meaning both "to supply" and "to make available."

serving as a shipping agent and an avenue by which FCS/FHM could access Wellmark's billing system."

In reaching its conclusion, the court rejected the position of Pharmacy Matters that "provide" meant "dispense" as that word was defined in the Iowa Pharmacy Practice Act. Under state law, "dispense" means "to deliver a prescription drug, device, or controlled substance to an ultimate user or research subject by or pursuant to the lawful prescription drug order or medication order of a practitioner, including the prescribing, administering, packaging, labeling, or compounding necessary to prepare the substance for that delivery." Iowa Code § 155A.3(11) (2011). That definition is further refined in the state regulations:

> "Dispense" includes:
> 1. Receiving the prescription drug order from the patient, the patient's agent, or the prescriber;
> 2. Delivering the filled prescription to the patient or the patient's agent;
> 3. Providing drug information concerning a patient's drug therapy;
> 4. Providing patient counseling.

Iowa Admin. Code r. 657-18.2.

The district court found the delivery of a prescription drug was "only a small part of the dispensing process" and also found "the determinative issue is not whether Pharmacy Matters satisfied the statutory definition of 'dispense' but, instead, whether it provided Covered Services as a home infusion therapy provider as contemplated in the contracts with Wellmark and WHPI."[8] The court

---

[8] The court's phraseology here closely tracks Wellmark's response to plaintiff's proposed statement of facts and conclusions of law.

then concluded: "All of the health care services of a HIT provider were provided by FCS Pharmacy, not Pharmacy Matters."

We believe the district court erred as a matter of law in declining to consider section 155A.3(11)'s definition of "dispense" in deciding whether Pharmacy Matters provided health care services under the Wellmark contract. Wellmark argues chapter 155A does not govern its HIT contracts. We disagree. As discussed above, according to Wellmark's own guidebook, home infusion providers are "licensed pharmacies that provide a wide range of services required to administer home infusion." Pharmacy Matters is licensed by the Iowa Board of Pharmacy. Chapter 155A regulates the practice of pharmacy and the licensing of pharmacies. *See* Iowa Code § 155A.2(1). The contract between Pharmacy Matters and Wellmark contained a provision stating: "This Agreement shall be construed and enforced in accordance with the laws of the State of Iowa." Because Wellmark drafted the contract, we presume it was aware of the law applicable to its providers.

By Iowa law, a pharmacy "dispenses" prescription drugs. *See* Iowa Code § 155A.3(31). When considering whether Pharmacy Matters provided "covered services," the district court should have acknowledged that Pharmacy Matters "dispensed" the Factor drugs by packaging and labeling the drugs for delivery. Pharmacy Matters also received the prescription drug order from the patient's agent, delivered the filled prescription to the patient or the patient's agent, and provided information concerning the patient's drug therapy. *See* Iowa Admin. Code r. 657-18.2.

While recognizing the Wellmark agreements defined "covered services" as "health care services or supplies," the district court's ruling did not define "health care services or supplies."[9] In lieu of a definition, the district court listed the services provided by FCS Pharmacy:

> FCS Pharmacy clinically managed the Patients, coordinated the Patients' care, communicated with the Patients and their caregivers, performed the pharmacy assessments, obtained the prescriptions, analyzed the prescriptions to determine dosage, assembled the patient specific dosages of factor drugs, and applied FCS prescription labels to the drugs. Pharmacy Matters was not allowed to alter the factor drugs in any way and did not perform any "health care services."

The district court also adopted the following finding from Wellmark's proposed ruling:

> During Wellmark's fraud investigation, Michael Stein made admissions that (1) sometimes he did not even open the box that he received from Florida containing the factor drugs . . . and (2) he doesn't review the package or check the number of units, he only forwards it on.

After closely scrutinizing the record, we do not find substantial evidence to support this factual finding by the court. *See NevadaCare*, 783 N.W.2d at 465–66. According to the notes from Wellmark investigator Robles's November 2008 meeting with Stein, Stein said he matched the dosage units to the patient's faxed prescription before shipping the drugs by FedEx to the patients. Robles's

---

[9] Pharmacy Matters directs us to the definition of "health care services" at Iowa Administrative Code rule 191–27.2 (defining as "services rendered or products sold by a health care provider within the scope of provider's license" and noting term includes but is not limited to, "hospital, medical, surgical, dental, vision, and pharmaceutical services or products"). We agree with Wellmark that this definition pertains to preferred providers and does not expressly apply to the contract at issue.

description of the interview is consistent with Stein's trial testimony, which the district court found credible on several other points.

Stein testified that under his contract with FHM, he was "supposed to dispense Factor medications as, their term, a third-party pharmacy and handle the billing responsibilities of the Factor that we dispensed." Stein also described the services provided by FHM: "[T]heir responsibilities would have been to provide the medication, the Factor, from their wholesale division. They also would provide, maybe what I'll call, back office or home office administrative-type support, as well as, you know, the disease management portion of the company, which we would have access to."

Stein testified that when he received a Factor shipment from FHM, he would open it as quickly as he could or store it in the refrigerator until he could process it. His process included "pulling out the prescription and other supporting documents" and comparing the labels to the actual packages to be sure it was the right product and the right amount. He then would "identify that NDC number and compare it to the label to make sure it would match." Stein also provided advisory leaflets for the patients. He then would affix his labels and repackage for shipping. Stein contends once the dispensing pharmacy affixes its labels on the prescription drugs, it is professionally liable to the patient. Stein also had some contact with the patients. For example, William Nolan, whose son had hemophilia, testified that when his family changed pharmacies, he "had a rule of calling the pharmacist and just, at least, telling them who we

were, making sure I could call after hours, making sure I had a number to call at night, that kind of thing."

The key question on appeal is whether Stein's actions amounted to providing "health care services or supplies" to which the hemophilia patients, all BCBSA members, were entitled under their benefit contracts. Stein contends he "dispensed" the prescribed drugs because "that's what pharmacists do," and he "billed Wellmark for Factor, not services." Wellmark replies that it sets reimbursement rates for the Factor drugs "at a level to provide compensation for the many services provided to the hemophilia patient," citing testimony of its vice president, Michael Fay.[10]

But regardless of how Wellmark sets its reimbursement rates, the language of the entity agreement only required Pharmacy Matters to provide "health care services or supplies" to the covered patients. By "dispensing" the Factor drugs, Pharmacy Matters did so. Nothing in the entity agreement required Pharmacy Matters to provide the whole "constellation" of services required to manage the disease of hemophilia. Where the language of a contract is clear, courts must not rewrite it for the parties. *See Amish Connection, Inc. v. State Farm Fire & Cas. Co.*, 861 N.W.2d 230, 236 (Iowa 2015). The fact that FHM and FCS provided other pharmaceutical services and coordinated the patients' care, as described in the district court's decision, does not negate the functions performed by Pharmacy Matters.

---

[10] Fay acknowledged on cross-examination that for home infusion providers, medical services and supplies are billed separately from therapeutic drugs.

The district court further concluded Pharmacy Matters did not provide "health care services" because even its own experts testified FCS could have dispensed the Factor drugs itself. That conclusion again overlooks the plain language of the contract. *See Broyles v. Iowa Dep't of Soc. Servs.*, 305 N.W.2d 718, 721 (Iowa 1981) (stating "when words are free from ambiguity, there is no occasion for interpretation"). Even if another pharmacy *could have* provided the same services as Pharmacy Matters, Wellmark agreed to make payment to the home infusion therapy provider, here Pharmacy Matters, in accordance with the terms of their entity agreement, specifically for claims incurred for "covered services," including injectable drugs.

Further, the issue here is not one of double billing. Only Pharmacy Matters sought reimbursement for the Factor drugs it "dispensed" to the patients. Nothing in the entity agreement prohibits a redundancy in the services provided for the fixed rate of reimbursement. In fact, pharmacist Donna Horn, an expert witness for Pharmacy Matters, testified: "Redundancy is preferred." She opined there was nothing wrong with pharmacist Stein coordinating with another pharmacy to deliver the Factor to the patients: "[I]f you have two sets of eyes looking at specific patient dosing, the chances of the patient getting the wrong medication are significantly decreased."

The district court accepted Wellmark's position that the only unique role played by Pharmacy Matters was billing as an in-network provider. Wellmark expert Brian McDonald opined: "Pharmacy Matters provided FCS and FHM with access to Wellmark's electronic billing system by which bills were submitted to

Wellmark and the BlueCross BlueShield system. FCS or FHM paid Pharmacy Matters a fee for this service." In McDonald's view, the claims Stein submitted to Wellmark "were based on the false premise that Pharmacy Matters had performed the pharmacy services and dispensed the prescriptions to the patients."[11]

Despite McDonald's skeptical view regarding the bills submitted by Pharmacy Matters, we see nothing nefarious about these patients choosing their pharmacy based on the pharmacy's access to more favorable reimbursement rates. William Nolan, one of the BCBSA customers, testified regarding his concerns about lifetime insurance caps: "If you don't have a major illness in your life, you don't know what that is. But if you have chronic disease or illness, you know you only have a certain amount of money to spend inside your insurance policy." Pharmacist Robert Gardner testified, if FHM could partner with a company that had contracts with BCBSA, it would "be able to hold down lifetime caps for patients, which was a huge concern for patients and their out-of-pocket responsibilities."

The district court—embracing Wellmark's reasoning—read the entity contract's obligation to provide "covered services" as an obligation to be the *sole* provider of *all* services associated with home infusion therapy for patients with hemophilia. That reading goes beyond the terminology used in the Wellmark-drafted entity agreements and in the Wellmark-drafted home infusion therapy

---

[11] McDonald also testified that delivering a drug to the patient was "an element" of "dispensing" and admitted he had no knowledge of Iowa's pharmacy laws concerning "dispensing."

guide. Because the court's flawed legal analysis had a material effect on its ultimate decision, we reverse its conclusion regarding the Factor drugs that Stein "dispensed" from Pharmacy Matters. *See Falczynski v. Amoco Oil Co.*, 533 N.W.2d 226, 230, 234 (Iowa 1995). Because Pharmacy Matters was a licensed pharmacy "dispensing" a necessary therapeutic drug as one of the "wide range of services" associated with home infusion therapy, it met its obligation to provide "healthcare services or supplies" to which the patients were entitled under their health insurance coverage. Accordingly, because Pharmacy Matters *did* provide "covered services," we conclude Wellmark breached its contract with Pharmacy Matters by denying payment.

***Emergency Shipments***. Having decided Pharmacy Matters provided "health care services" when Stein dispensed the Factor drugs from his pharmacy, we turn to the question of whether he likewise did so for the emergency shipments that did not pass through Iowa City. In this case, 114 of the 118 insurance claims at issue involved drug shipments sent to the patients from the physical location of Pharmacy Matters. Four of the shipments were sent directly from FCS to the patients in response to health emergencies.

The district court found: "There is no justification for Pharmacy Matters submitting more than $1 million of claims for drugs that were never in its possession." We agree.

Pharmacy Matters argues "Stein was the dispensing pharmacist for those four emergency shipments, even though the Factor did not pass through his pharmacy." Stein testified he gave approval for the shipments to be sent directly

from FHM, in coordination with the FCS pharmacist in charge. When questioned by Wellmark's attorney concerning the labeling of those prescriptions, Stein testified: "[T]he labeling was probably not as high in my mind priority-wise as getting that patient Factor medication to get them through a critical situation."

Regardless of the emergency situations, Pharmacy Matters could not dispense drugs that never passed through Iowa. Katherine Linder, a former member of the Iowa Board of Pharmacy, testified that Stein, as an Iowa pharmacist, cannot dispense a drug simply by declaring that he is taking responsibility for the drug shipment. Linder opined it "wouldn't be possible for [Stein] to be the 'health care provider' in that circumstance at all."

As discussed above, "dispense" means to package or label the drugs for delivery. *See* Iowa Code § 155A.3(11). Stein did not package or label the four shipments that did not go through his pharmacy. He did not check the NDC numbers on those prescriptions, nor did he have the opportunity to compare the contents of the shipments to the prescribed doses. Unlike the other shipments, Stein did not deliver those four prescriptions to the patient or the patient's agent.

Because Pharmacy Matters did not provide "covered services" for the four emergency shipments, we affirm the district court's conclusion that Pharmacy Matters breached its contractual obligation in those four instances. Accordingly, Pharmacy Matters is not entitled to reimbursement for those four shipments in the amount of $1,025,025.20.

**B.     Did Pharmacy Matters Violate the Anti-Assignment Clauses of the Entity Contracts?**

We next turn to Wellmark's claim that Pharmacy Matters breached the entity contracts by assigning its rights or delegating its duties without Wellmark's consent. As discussed above, both the Wellmark and WHPI contracts included a clause prohibiting the "assignment of the rights, duties or obligations of this Agreement."

The district court found these provisions reflected the parties' intentions to prohibit "not only the transfer of rights, but also the delegation of duties and obligations." The court opined: "The terms 'assign' and 'delegate' are synonyms and commonly used interchangeably." The court concluded: "Pharmacy Matters impermissibly delegated its contractual duties and obligations to FCS Pharmacy (by virtue of FCS Pharmacy supplying all of the health care services to the Patients) and impermissibly made a de facto assignment to FHM of its contractual payment rights (by remitting 100% of payments to FHM)."[12] We do not find support in the record or in Iowa law for the court's conclusions.

The word "assignment," according to an early pronouncement by our supreme court, "has acquired a peculiar and appropriate meaning in law, is a technical word, and must be construed according to that peculiar and appropriate meaning." *Cowles & Co. v. Ricketts*, 1 Iowa 582, 582 (1855). "An assignment involves the transfer of the entire rights under a contract from the assignor to the assignee so that the assignee assumes not only the benefits of the contract, but

---

[12] This conclusion is adopted verbatim from Wellmark's proposed ruling.

also the rights and remedies." *Ross v. First Sav. Bank*, 675 N.W.2d 812, 817 (Iowa 2004) (citing *Red Giant Oil Co. v. Lawlor*, 528 N.W.2d 524, 533 (Iowa 1995)). Anti-assignment clauses "are construed narrowly whenever possible." 29 *Williston on Contracts* § 74:22 (4th ed. May 2015).

"[D]uties cannot be assigned, they are delegated by the obligor to a person who assumes the obligation." *Barker Dev. Co. v. Unibank & Trust Co.,* 314 N.W.2d 175, 178 (Iowa Ct. App. 1981). The district court correctly noted that parties often do not distinguish between these terms of art. *See id.* Although delegation is a distinct concept from assignment, "'[u]nless the language or the circumstances indicate the contrary, . . . an assignment of 'the contract' or of 'all my rights under the contract' or an assignment in similar general terms is an assignment of the assignor's rights and a delegation of his unperformed duties under the contract.'" *See Midland Mut. Life Ins. Co. v. Mercy Clinics, Inc.*, 579 N.W.2d 823, 833 (Iowa 1998) (quoting Restatement (Second) of Contracts § 328(1) (1979)).

After closely reviewing the trial record, we do not find substantial evidence to support the district court's conclusion that Pharmacy Matters assigned all of its rights *or* delegated its duties as delineated in the Wellmark entity agreements. The "contract pharmacy agreement" that Pharmacy Matters entered into with FHM did not mention any assignment or delegation by Pharmacy Matters. In fact, that agreement required Pharmacy Matters to distribute the Factor products for FHM. The "contract pharmacy agreement" also stated Pharmacy Matters was "solely responsible for confirming, dispensing, and labeling all Factor products

sold to customers." Further, the "contract pharmacy agreement" placed a host of other requirements on Pharmacy Matters. For example, Pharmacy Matters, as the contracting pharmacy, had to be licensed; had to be authorized to dispense the Factor products; had to be on-call twenty-four hours a day, seven days a week, 365 days a year to respond to emergency calls from customers and from FHM; and had to keep "timely, accurate and complete records" of the pharmacy services provided.

Nevertheless, the district court decided Pharmacy Matters delegated "virtually all" of its contractual duties under the Wellmark entity agreements to FHM without Wellmark's consent. In finding Pharmacy Matters breached the anti-assignment clauses, the district court emphasized the following facts:

> 1. It was FCS Pharmacy, rather than Pharmacy Matters, that supplied health care services for the Patients. FCS Pharmacy clinically managed the Patients; had communications with the Patients, their caregivers, and the Providers; and prepared the pharmacy assessments and progress notes.
> 2. FCS pharmacists interpreted the prescriptions for Factor Drugs based on the current weight information that FCS obtained regarding the Patients. FCS assembled the Factor Drugs into patient-specific assays.
> 3. All of the Factor Drugs left Florida bearing an FCS Pharmacy prescription label after having been checked by an FCS pharmacist.
> 4. More than $1 million of the Factor Drugs did not pass through Pharmacy Matters' facility.
> 5. Even when it did have physical possession of the Factor Drugs for a period of time, Pharmacy Matters was not allowed to alter the Factor Drugs it received from FCS Pharmacy.

These factual findings, which were also set out in Wellmark's proposed ruling, do not show Pharmacy Matters delegated its duty to provide "covered services" under the Wellmark entity agreements. At most, these findings

illustrate the view of the Pharmacy Matters' expert that the provision of the "covered services" to the hemophiliac patients "was really a team approach." Kenneth Baker, a pharmacy consultant, opined:

> It was a beautiful way of putting it together, so that you had the expertise [in Factor Health]; you had a guy with a contract with the insurance company who could actually fill the prescription; and . . . the Blue Cross member could get taken care of. . . . That's a beautiful system from a quality assurance standpoint. . . . [Y]et, it's what confused everybody when they started looking at this.

Confusion aside, nowhere in the record did Pharmacy Matters expressly assign its rights or delegate unperformed duties under its entity agreements with Wellmark to FHM/FCS. In its "contract pharmacy agreement" with Pharmacy Matters, FHM did not assume the obligation of providing "covered services" as contemplated in the Wellmark agreements. It was Pharmacy Matters that took sole responsibility for "confirming, dispensing, and labeling all Factor products sold to customers."

The question really returns to whether the "constellation" of services associated with home infusion therapy for hemophiliac patients can be unbundled. The district court embraced Wellmark's position that Pharmacy Matters violated the anti-assignment clauses by performing only the labeling, packaging, and delivery of the Factor drugs to the patients and leaving the clinical management of the patients to FHM and FCS. As our previous analysis concluded, that position was inconsistent with the unambiguous terms of the entity agreements.

We also find error in the district court's legal conclusion that Pharmacy Matters made a de facto assignment of its rights under the Wellmark agreements

by contracting to send "100% of any reimbursement" from the third-party payor to FHM in exchange for a 1.5% dispensing fee." Iowa has no case law discussing de facto assignments. We recognize no specific words are required to effect an assignment. *See In re Wagner*, 144 B.R. 430, 437 (Bankr. N.D. Iowa 1991). Any language will suffice if it shows an intent to transfer the right to the assignee. *Id.* But an agreement to transfer future reimbursements is not an assignment. *See Carey v. Chase*, 175 N.W. 60, 62 (Iowa 1919). "To constitute a valid assignment, there must be a perfected transaction between the parties, intended to vest in the assignee a present right in the thing assigned." *Id.* The "contract pharmacy agreement" between Pharmacy Matters and FHM did not vest in FHM a present right to payments from Wellmark. Because Pharmacy Matters retained control over the future reimbursements from Wellmark and had the authority to collect them, Pharmacy Matters' arrangement with FHM did not constitute an assignment. *See id.* at 61-62.

*Wellmark Provider Guide.* In addition to interpreting the language in the entity contract, the district court also adopted Wellmark's position that the Wellmark Provider Guide—incorporated by reference into the entity agreement— included a "warning" to Pharmacy Matters that the kind of relationship it entered into with FHM and FCS was prohibited by the anti-assignment clause. At issue is the following language from the Provider Guide's chapter on Contracts and Credentialing, under the subheading of Supervisory responsibilities:

> There may be situations when a practitioner who is not eligible to contract with Wellmark directly hires or contracts with eligible practitioners as a consultant and uses the eligible practitioner's

direct contracting status with Wellmark to file claims and receive payment. Such arrangements are not accepted by Wellmark.

We find the court's reliance on the Provider Guide was misplaced. In carefully scrutinizing the record, we conclude the cited paragraph does not apply to Pharmacy Matters' relationship with FHM and FCS. The Provider Guide divides "licensed providers" into three categories: (1) practitioners, (2) facilities, and (3) entities. The Provider Guide's list of practitioners includes doctors, nurses, and other individual professionals. The list of facilities includes hospitals and other medical centers. The list of entities includes services such as Home Infusion Therapy Providers—the category under which Pharmacy Matters was billing. Accordingly, the Provider Guide's "warning" regarding non-eligible "practitioners" filing claims using the status of an eligible "practitioner" does not, by its very terms, apply to an entity like Pharmacy Matters.

***Personal Services Contract***. The district court also ruled that the entity agreements were "a type of personal service contract" under which the obligations were "not delegable." We disagree with this legal conclusion.

"A contract for personal services contemplates performance of duties involving the exercise of special knowledge, judgment, taste, skill, or ability." *Corell v. Teamsters Local Union No. 828*, No. 00-1098, 2002 WL 31018534, at *2 (Iowa Ct. App. Sept. 11, 2002). Under personal services contracts, the assigned duties are so specialized that they cannot be delegated to another party. *Id.* (citing Restatement (Second) of Contracts § 318(2) (1981)). Courts have found authentic personal-services contracts in the following instances: "[A] contract to paint a picture; a contract between an author and his publisher; an agreement to

sing; an agreement to render service as a physician." *See In re Compass Van & Storage Corp.*, 65 B.R. 1007, 1011 (Bankr. E.D.N.Y. 1986) (collecting cases); *see also Lemat Corp. v. Barry,* 80 Cal. Rptr. 240, 245 (Cal. Ct. App. 1969) (discussing contract for unique personal services of star athlete).

Initially, Pharmacy Matters suggests business entities or corporations do not generally enter into personal-service contracts. While it is true most contracts "falling within the 'personal services' exception are employment contracts of individuals, it does not follow that a corporation cannot enter into such an agreement." *See Ford, Bacon & Davis, Inc. v. Holahan*, 311 F.2d 901, 903–04 (5th Cir. 1962). So, while Pharmacy Matters may be capable of entering a personal-services contract, we conclude it did not do so when it entered into the entity agreements with Wellmark.

First, the agreements between Wellmark and Pharmacy Matters did not contain language expressing that the pharmacy would be providing "personal services." Second, while Pharmacy Matters, through pharmacist Stein, possessed certain specialized knowledge and expertise, it was not the kind of unique skill set that would justify a finding he was providing personal services to Wellmark by dispensing the Factor drugs. *See Corell*, 2002 WL 31018534, at *3 (finding skills of union's office secretary were "not unique or nondelegable"). We reject this basis for finding Pharmacy Matters breached its agreements with Wellmark.

**IV.    Conclusion**

We reverse the district court's ruling that Pharmacy Matters materially breached the entity agreements with Wellmark by not providing "covered services" in relation to the 114 shipments of Factor drugs that Stein dispensed from his pharmacy in Iowa City.  We affirm the court's ruling in regard to the four emergency shipments that did not pass through Iowa.  We also reverse the district court's ruling that Pharmacy Matters breached the anti-assignment clauses of the entity agreements.  Conversely, we conclude Wellmark breached the agreements by not paying those 114 claims submitted by Pharmacy Matters. We remand for the district court to determine, consistent with this opinion, what damages are owed to Pharmacy Matters.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**