Tony ROSS, et al., Appellants,

v.

Thousand Adventures of Iowa,
et al., Defendants,

and

FIRST SAVINGS BANK OF
ARLINGTON, Appellee.

No. 02–0697.

Supreme Court of Iowa.

Feb. 25, 2004.

Douglas H. Napier and William H. Napier, Napier, Wolf & Napier, Fort Madison, for appellants.

Thomas D. Waterman of Lane & Waterman L.L.P., Davenport, and John M. Rogers of Rogers Law Firm, P.L.L.C., Weatherford, Texas, for appellee.

Robert L. Hartwig, Johnston, for amicus curiae Iowa Bankers Association.

CADY, Justice.

This appeal presents the issue whether Iowa courts have personal jurisdiction over a nonresident participant bank to a participation agreement with a nonresident lead bank involving a pool of retail installment contracts, some of which were entered into by the vendor in Iowa with Iowa residents, in an action by the vendees for breach of the installment contracts. The district court determined it did not have personal jurisdiction over the nonresident participant bank and granted its motion to dismiss. On our review, we affirm the district court.

## I. Background Facts and Proceedings.

Plaintiffs are consumers who purchased memberships in a nationwide network of fifty-eight recreational vehicle campgrounds operated by Thousand Adventures, Inc. The memberships provided access and other privileges to the campgrounds. Five of the named plaintiffs are Iowans and four of the campgrounds are located in Iowa. The memberships were purchased through real estate installment contracts with Thousand Adventures, Inc., in amounts up to $10,000, typically payable over a period of less than five years. The contracts included a notice providing, in essence, that any holder of the contract was subject to all claims and defenses the retail consumer could assert against the campground company.[1]

Thousand Adventures, Inc. subsequently sold packages or pools of the installment contracts to various financial institutions and investors around the country,

including Western American National Bank (Western) of Bedford, Texas. Western then sold fractional interests in its undivided pool of installment contracts to other banks, including First Savings Bank (First Savings) of Arlington, Texas. The contract between Western and First Savings was entitled "Certificate of Participation." Under this contract, First Savings purchased a fifty percent participation interest in the pool of retail installment contracts for $2.5 million. The contract provided that Western and First Savings would "share income, principal reductions and expenses including servicing on a pro-rata basis." However, Western retained physical custody of the contracts, and was solely responsible for handling the collections from the consumers of the installment payments required to be made pursuant to the contracts. Western was not required to pay First Savings its share of the collections until Western actually collected the payments from the consumers. Although not formally known by First Savings at the time it acquired its participation interest, some of the installment contracts in the pool were with Iowans.

Plaintiffs filed an action against Thousand Adventures, Inc. and its Iowa subsidiary, Thousand Adventures of Iowa, Inc. (collectively Thousand Adventures), in the Iowa district court. The plaintiffs claimed Thousand Adventures failed to provide all the promised benefits of the membership. The case was certified as a class action and default judgment was entered against Thousand Adventures. Thousand Adventures then filed for bankruptcy. Plaintiffs subsequently amended their petition to as-

---

1. The full clause provided:

   NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

sert claims against eighteen financial institutions that had acquired an interest in the installment contracts either by assignment or certificate of participation. Two of these financial institutions were Western and First Savings.

After the additional defendants unsuccessfully sought removal of the action to federal court, First Savings filed a motion to dismiss for lack of personal jurisdiction. An affidavit attached to the motion, prepared by an officer of First Savings, revealed First Savings was a federal savings bank doing business in Texas. Furthermore, it had no agents or offices in Iowa, no property in Iowa, and had never solicited or conducted business in Iowa. First Savings also had never had any direct contact with the plaintiffs or any of the parties to the real estate installment contracts.

The district court dismissed the action against First Savings. It found First Savings had insufficient minimum contacts with Iowa to support personal jurisdiction. In particular, it found First Savings was not an assignee or holder of the installment contracts and was not an agent of Western. It also found there was no privity of contract between First Savings and the plaintiffs.

Plaintiffs appealed. They claim sufficient minimum contacts exist for the Iowa court to assert personal jurisdiction over First Savings because the contract between Western and First Savings makes First Savings a holder of the consumer retail sales contracts and it is consequently subject to all claims of the consumers as if it was the original party to the contract. Thus, the issue we face is whether the participation arrangement between Western and First Savings establishes sufficient minimum contacts with Iowa for purposes of asserting personal jurisdiction over First Savings.

## II. Scope of Review.

In reviewing a district court's decision concerning personal jurisdiction, we are not bound by its conclusions of law or application of legal principles. *Hodges v. Hodges*, 572 N.W.2d 549, 551 (Iowa 1997). We accept "the allegations of the petition and the contents of uncontroverted affidavits" to be true. *Id.*

## III. Minimum Contacts.

The Due Process Clause of the Fourteenth Amendment to the federal constitution limits the power of a state to assert personal jurisdiction over a nonresident defendant to a lawsuit. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 413–14, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404, 410 (1984). It protects the liberty interest of an individual from becoming bound to a judgment of a state court where there is no meaningful contacts or relations with the state. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–72, 105 S.Ct. 2174, 2181, 85 L.Ed.2d 528, 540 (1985). Thus, personal jurisdiction over a nonresident defendant can exist under the Due Process Clause only when "the defendant has 'certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." ' " *Heslinga v. Bollman*, 482 N.W.2d 921, 922 (Iowa 1992) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95, 102 (1945) (citation omitted)). The minimum contacts must show "a sufficient connection between the defendant and the forum state so as to make it fair" and reasonable to require the defendant to come to the state and defend the action. *Hodges*, 572 N.W.2d at 551. This test makes it "essential in each case that there be some act by which the defendant purposely avails itself of the privilege of conducting activities

within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283, 1298 (1958). Random or attenuated contacts do not meet this test. *See Rudzewicz*, 471 U.S. at 475, 105 S.Ct. at 2183, 85 L.Ed.2d at 542.

■ We consider five factors to determine whether a nonresident defendant has sufficient minimum contacts with Iowa:

(1) the quantity of the contacts;

(2) the nature and quality of the contacts;

(3) the source of and connection of the cause of action with those contacts;

(4) the interest of the forum state; and

(5) the convenience of the parties.

*Cascade Lumber Co. v. Edward Rose Bldg. Co.*, 596 N.W.2d 90, 92 (Iowa 1999); *Hodges*, 572 N.W.2d at 552. The first three factors are considered the most important. *Cascade Lumber Co.*, 596 N.W.2d at 92.

■ The essence of the connection between First Savings and the State of Iowa for the purposes of the due process analysis is found in the contract giving First Savings the right to receive a portion of the amounts collected by the assignee of a pool of retail installment contracts, including contracts entered into between the plaintiffs to this litigation and the vendor-assignor. Yet, we recognize "that a contract *alone* cannot automatically establish sufficient contacts." *Hager v. Doubletree*, 440 N.W.2d 603, 607 (Iowa 1989) (citing *Rudzewicz*, 471 U.S. at 478, 105 S.Ct. at 2185, 85 L.Ed.2d at 544-45). Instead, the minimum contacts test looks to the entire transaction—prior negotiations, contemplated future consequences, terms of the contract, and the course of dealings—to assess the sufficiency of the defendant's contacts. *Id.*

Plaintiffs characterized the participation agreement between First Savings and

Western as an assignment of the retail installment contracts, and seek to use the terms and circumstances surrounding the installment contracts to drive the minimum contact analysis. Thus, it is appropriate for us to begin our resolution of the issue by reviewing the nature of the agreement between First Savings and Western.

We have previously considered the use of participation agreements between banks in the context of loans. In *In re Receivership of Mount Pleasant Bank & Trust Co.*, 526 N.W.2d 549, 556 (Iowa 1995), we rejected the claim that a participant bank in such an arrangement was a mere creditor in a bank receivership proceeding. Instead, we recognized that the lead bank was contractually obligated to pay the participant banks their fair share of the payments received on loans as provided under the agreement upon receipt of any payments from the debtors. *Id.* We observed:

A loan participation is a solution to the lending limits federal and state laws place on banks in order to reduce the banks' risk of insolvency. Lending limits for small banks often prevent them from making loans which meet the needs of their principal customers. By engaging in a loan participation, a "lead bank" can lend an amount to a customer in excess of the bank's lending limit, divide the loan into shares, and then contract to sell the shares to "participating banks." The result of the agreement is that the banks share in sponsoring the customer's loan and thereby do not exceed their lending limits.

*Id.; see also* Iowa Code § 524.904 (2001) (lending limits for state-chartered banks); 12 U.S.C. § 84 (2000) (lending limits for nationally-chartered banks); 12 C.F.R. § 32 (2003) (same).

■ It is clear that a loan participation agreement comes into existence only after a lender, known as the lead

bank, contracts with the borrower or obtains an assignment of a contract with the borrower. It "then makes a separate agreement—the participation agreement—with other banks, to which the lead bank sells shares in the loan ... evidenced by participation certificates." *First Nat'l Bank v. Cont'l Illinois Nat'l Bank & Trust Co.*, 933 F.2d 466, 467 (7th Cir.1991). Although this arrangement has some elements of an assignment, it falls well short of the traditional concept of an assignment because it merely involves the transfer of a portion of an intangible right. *See Iowa Supreme Ct. Comm'n on Unauthorized Practice of Law v. A–1 Assocs., Ltd.*, 623 N.W.2d 803, 808 (Iowa 2001); W.H. Knight Jr., *Loan Participation Agreements: Catching Up With Contract Law*, 1987 Colum. Bus. L.Rev. 587, 612–13 (1987). An assignment involves the transfer of the entire rights under a contract from the assignor to the assignee so that the assignee assumes not only the benefits of the contract, but also the rights and remedies. *Red Giant Oil Co. v. Lawlor*, 528 N.W.2d 524, 533 (Iowa 1995). Importantly, a participation agreement does not give the participant bank control over collection of the loan or contract. *See Banque Arabe et Internationale D'Investissement v. Bulk Oil (USA), Inc.*, 726 F.Supp. 1411, 1417 (S.D.N.Y.1989). Instead, only the lead bank maintains a contractual relationship with the borrower. *First Nat'l Bank*, 933 F.2d at 467. The participant bank is not a creditor of the borrower, has no ability to assert a claim against the borrower, and can only look to the lead bank for satisfaction of its claims. *Hibernia Nat'l Bank v. FDIC*, 733 F.2d 1403, 1407 (10th Cir.1984); *see* Patrick J. Ledwidge, *Loan Participations Among Commercial Banks*, 51 Tenn. L.Rev. 519, 524, 528 (1984). Additionally, the participating bank is not a creditor of the lead bank, but is merely entitled to recover from the lead bank a share of the money the borrower pays the lead bank. Ledwidge, 51 Tenn. L.Rev. at 524.

These relationships clarify the activities and contacts of the lead bank and the participant bank with the forum state of the borrower or obligor for purposes of determining personal jurisdiction. They reveal it is the lead bank, not the participant bank, which maintains contact with the forum state by collecting the payments. It also reveals the borrower's contact with the loan is with the lead bank. The participant bank has no relationship with the borrower, and no direct contact with the forum state in relation to the participation agreement.

While this case involves a participation agreement where the underlying transactions are retail installment contracts acquired by the lead bank through an assignment, not loans, this difference does not change the nature or treatment of the participation agreement or the limited role of the participant bank. The participant bank still has no contractual relationship with the consumers who entered the installment contracts and is not entitled to assert its rights under the participation agreement against the consumers. Accordingly, the participation agreement in this case, like loan participation agreements, is not an assignment. It simply represents a secondary market financing tool commonly used by banks that has become a vital aspect of today's banking and lending practices. *See In re Receivership of Mount Pleasant Bank & Trust Co.*, 526 N.W.2d at 556; *see also* Knight, 1987 Colum. Bus. L.Rev. at 588–89. It is primarily a financing mechanism for the lead bank to remain within the permissible lending limitations and an investment for the participant bank where its lendable funds can be placed into a more favorable market. *See* Ledwidge, 51 Tenn. L.Rev. at 522–23. It is a world removed from the

traditional assignment of loans. Clearly, our failure to recognize the legal and practical distinctions between these two worlds for personal jurisdictional purposes would heap havoc on the Iowa banking industry and those banks that compete in the secondary market. While Iowa certainly has an interest in protecting its residents, it also has an interest in protecting the interests of its banking industry. It would not be reasonable for a participant bank to expect to be haled into court in the resident state of each obligor to the underlying installment contract, absent some additional contacts beyond its status as a participant bank.

We conclude participation agreements of the type involved in this case do not alone establish sufficient minimum contacts between the forum state where the contracts in the pool were executed and a nonresident participant bank. In this case, the nature of the participation agreement reveals the participant bank has no purposeful contact with Iowa. The agreement merely involves the purchase from a nonresident bank of a right to receive a portion of whatever contract payments are collected by the nonresident lead bank. The participation agreement also shows the participant bank has no real connection to the underlying cause of action between the vendor and the vendee to the retail installment contract.

Notwithstanding, the plaintiffs claim First Savings is a "holder" of the retail installment contracts and this consequently subjects it to all claims by the consumers pursuant to the holder notice contained in the retail installment contracts. Plaintiffs rely upon this proposition to establish minimum contacts with Iowa.

The holder notice found in the installment contracts is imposed by the Federal Trade Commission and is known as the FTC holder rule. *See* 16 C.F.R. § 433.2. This rule is based on the under-

standing that contractual obligations are frequently transferred as negotiable instruments, and seeks to protect consumers from being required to make payments under the contract to a holder of the contract even though the consumer may have a valid defense to payment against the original vendor of the contract. *See Ford Motor Credit Co. v. Morgan,* 404 Mass. 537, 536 N.E.2d 587, 589 (1989) (the holder rule is designed to preserve consumer's claims and defenses by cutting off rights of creditors as a holder in due course). Thus, this rationale is inapplicable to a participant bank to a participation agreement since the participant bank has no right to collect directly from the consumer. Additionally, the failure to include a participant bank within the definition of a holder does not harm the consumer because the consumer is still able to assert any claims and defenses against the lead bank to the participation agreement, as a holder of the contract. Therefore, the interests of Iowa residents in not paying installment contracts when a valid defense exists can be protected without subjecting a participant bank to our jurisdiction.

There is also no support for the claim by the plaintiffs that a "holder" of an instrument includes the participant bank to a participation agreement. *See Bank of Mulberry v. Fireman's Fund Ins. Co.,* 720 F.2d 501, 502 (8th Cir.1983) (distinguishing purchaser of participation interest from a holder). A holder of a negotiable instrument is a person "in possession," and possession of the retail installment contracts in this case is with Western, not First Savings. *See* Iowa Code § 554.1201(20). Furthermore, the participation agreement itself is not a negotiable instrument because it is conditional on the collection of the payments by Western. *See FDIC v. State Bank,* 893 F.2d 139, 142 (7th Cir. 1990) (FDIC was not a holder because "loan participation is not itself a negotiable

instrument, even though the underlying note may have been").

■ Similarly, we reject the argument by the plaintiffs that the minimum contact test is met because Western was an agent of First Savings. We acknowledge that the activities of an agent within a state may support personal jurisdiction of a nonresident principal. We also acknowledge that a participation agreement creates a form of an agency in the relationship between the lead bank and the participant bank. This relationship imposes legal rights and obligations, and means the lead bank acts for the benefit of the participant bank within the context of the agreement. However, for jurisdictional purposes, the agent must act in the forum state under the control of the nonresident principal. The participation agreement makes it clear that the role of First Savings is very limited. Western is the responsible party to collect the payments independent of any control by First Savings. The lead bank continues to conduct its business with the consumer, and the presence of the participant bank does not alter this activity. The participant bank vests tremendous discretion and reliance in the lead bank to service the installment contract. See Knight, 1987 Colum. Bus. L.Rev. at 612–13 ("The fact that the lead [bank] retains possession of the note[s] means that the participant has given the lead the power to control the participant's rights and claims based on the instrument. Each participant trusts the lead, and expects it to act to protect the participant's interest in the loan."). First Savings is paid a return on its investment in the arrangement only through the proceeds collected by Western with no servicing expense. See id. at 589.

In considering the activities of Western and First Savings for jurisdictional purposes, there is nothing to show First Savings has purposely availed itself of the benefits of dealing with Iowa residents by entering into the participation agreement. Hanson, 357 U.S. at 253, 78 S.Ct. at 1240, 2 L.Ed.2d at 1298. To the contrary, First Savings is merely a passive investor. See Al–Jon, Inc. v. Garden St. Iron & Metal, Inc., 301 N.W.2d 709, 714 (Iowa 1981) (recognizing a distinction between active and passive purchaser in the personal jurisdiction context); see also State ex rel. Miller v. Grodzinsky, 571 N.W.2d 1, 3–4 (Iowa 1997) (something more than individual corporate employee defendant's association with a corporation subject to personal jurisdiction is necessary to permit exercise of personal jurisdiction over employee defendant).

We consider and reject all arguments made by the plaintiffs to support personal jurisdiction over First Savings in this case.[2] We conclude that First Savings, as merely a participant bank to a participation agreement, does not have sufficient minimum contacts with Iowa to support personal jurisdiction. First Savings has not purposely availed itself of the privilege of conducting activities with Iowans. Its contact with Iowa is simply too attenuated.

### IV. Conclusion.

It would offend traditional notions of fair play and substantial justice to find Iowa courts have personal jurisdiction over First Savings. We conclude the district

---

**2.** We also specifically reject the argument by plaintiffs that the Uniform Consumer Credit Code, Iowa Code chapter 537, provides an independent statutory basis for personal jurisdiction. Iowa Code § 537.1101–.8101 (2001). This argument was not preserved. See Meier v. Senecaut III, 641 N.W.2d 532, 537 (Iowa 2002). Even if the argument had been preserved, our discussion of the minimum contacts test reveals First Savings was not a creditor as defined by section 537.1301(17).

court properly granted the motion to dismiss for lack of personal jurisdiction.

**AFFIRMED.**