# IN THE COURT OF APPEALS OF IOWA

No. 18-0738
Filed July 24, 2019

**NPZ, INC. d/b/a ZTRAPS,**
 Plaintiff-Appellant,

**vs.**

**ULTRA IMAGE POWDER COATING and ALTRA CORPORATION, d/b/a ULTRA IMAGE POWDER COATING,**
 Defendants-Appellees.
_____

Appeal from the Iowa District Court for Crawford County, Steven J. Andreasen, Judge.

An Iowa live-trap manufacturer appeals an order dismissing its suit against a Minnesota powder-coating company. **REVERSED AND REMANDED.**

Jason B. Bottlinger of Bottlinger Law, L.L.C., Omaha, Nebraska, for appellant.

Brian D. Moore of Baird Holm LLP, Omaha, Nebraska, for appellees.

Heard by Doyle, P.J., and Tabor and Mullins, JJ.

**TABOR, Judge.**

When sued by an Iowa company, the Minnesota-based defendant moved to dismiss—not wanting to be trapped in the Iowa courts. The district court agreed with the nonresident defendant, dismissing the lawsuit for want of personal jurisdiction. The Iowa company now appeals.

Because the Minnesota company had sufficient contacts with the forum state through its business relationship with the Iowa manufacturer, we find the nonresident is subject to personal jurisdiction in this case. Thus, we remand the case for further proceedings.

**I.      Background Facts and Proceedings.**

Neil Ziegmann is the president of N.P.Z., Inc., which does business as ZTraps. ZTraps's principal place of business is in Kiron, Iowa, where he manufactures and sells live-animal traps. When Ziegmann needed to find a company to powder coat[1] some raccoon traps, he enlisted the aid of Jim Thielen. Thielen ran a marketing firm in Buffalo, Minnesota.

In November 2015, Thielen—acting as the middleman—reached out to Altra Corporation[2] about the possibility of powder coating raccoon traps for Ziegmann. After initial exchanges with Thielen,[3] Altra provided a cost estimate of

---

[1] "Powder coating" is a protective or decorative coat "formed by the application of a coating powder to a substrate and fused into continuous films by the application of heat or radiant energy." Powder Coating Inst., *Powder Coating Glossary of Terms & Definitions*, https://www.powdercoating.org/page/Glossary (last visited July 11, 2019).

[2] In September 2013, Altra Corporation acquired Ultra Image Powder Coating, Inc. We refer to the company and individuals involved collectively as Altra (unless otherwise relevant).

[3] Altra contends the correspondence was over the phone, by email, and through Thielen's visits to its office in Big Lake, Minnesota. Micah Noaeill, Altra's vice president of operations, stated in his affidavit that he personally received metal traps from Thielen so he could obtain the price estimate.

$15,000 for powder coating 30,000 raccoon traps. Altra's December 2015 price estimate was addressed to Thielen Marketing at its Buffalo, Minnesota address.

In April 2016, Thielen emailed Ben Johnson (carbon copying Ziegmann) with the proposed terms of the deal:

> Hi Ben Z[T]raps would like to manage painting of 30,000 Ztraps as follows.
> The week of 4/18 Z[T]raps delivers 6,000 pcs to [Altra] via truck line for powder coat
> - Paint over Ztrap decal
> - Paint over bar code
> - *Cover tip of dog so it is not painted
> - [Altra] puts traps in plastic bag, provided, and bulk packages
> When order is complete, Z[T]raps will deliver 6,000 additional traps and pick up the painted traps. This will continue until all 30,000 traps have been painted.
> Target deadline to complete project is 7/31/16.
> Let's discuss.
> Thanks Ben,
> **Jim Thielen**
> Thielen Marketing, Inc
> 612[4]-[phone number]

---

[4] Altra maintains it recognized 612 as a Minnesota area code.

Two months later, ZTraps emailed Altra the following purchase order prominently featuring ZTraps's Iowa address:



**PURCHASE ORDER**

270 East Shore Drive
Lake View, IA 51450

Phone: 800-650-4504
Fax: 712-657-3200

Contact: Jim Thielen
612-███-████

| Purchase Order No.: | 109852 |
|---|---|
| Order Date: | 6/27/2016 |
| Ship Date: | TBD |
| Freight: | FOB, Collect |
| Due Date: | Net |

Ultra Image Powder Coating
20060 177th St
Big Lake, MN 55309

Ben Johnson

| SALESPERSON | SHIP VIA | PAY TERMS | FREIGHT TERMS |
|---|---|---|---|
| Jim Thielen | FOB, Kiron, IA | Net | FOB, Collect |

| Item | DESCRIPTION | QUANTITY | UNIT PRICE / DZ | LINE TOTAL |
|---|---|---|---|---|
| 5418 | Ztrap - Brown | 30,000 | $0.50 | $15,000.00 |
| | | | | |

Comments:
- paint Ztrap brown as per approved pantone
- paint outside and inside of trap tube
- cover dog end
- bulk pack and protect with foam to avoid scratching of finish

If you have any questions concerning this order, please contact:
Jim Thielen 612-868-0875

**THANK YOU !**

| | |
|---|---|
| SUBTOTAL | $15,000.00 |
| Deductions | |
| Freight / Duty | |
| Fees | |
| Total Due | $15,000.00 |

In July 2016, ZTraps sent 30,000 of its traps to Altra's Minnesota facility. The next month, Altra completed powder coating 25,716 of the traps. In September 2016, Altra emailed Thielen an invoice for the powder coating. That same day, a truck retrieved the completed traps from Altra to return them to ZTraps. Although Altra sent the email to Thielen, the attached invoice listed the billing recipient as ZTraps at its Iowa address.

ZTraps was dissatisfied with the powder coating on the traps, describing the work as "not uniform; there were large splotches of white, in varied stages of opacity, on the traps. Other portions of the traps [were] not powder coated at all." So Thielen visited Altra's Minnesota office to discuss a possible resolution. After meeting with Thielen, Altra agreed to pay for shipping the powder-coated traps from Kiron to Altra's Minnesota facility. And Altra agreed, upon receiving the shipment, it would sort through the traps to identify the powder coating ZTraps found deficient.[5] Altra would then recoat the substandard traps and return all traps to Iowa, again paying for shipping and delivery.

Thielen followed up by email after the meeting to confirm the terms discussed. The email also offered contact information for Auen Trucking, the Iowa company ZTraps hired for the July shipment, in case Auen offered a more favorable rate than another carrier Altra might solicit. Altra requested the information so it could compare rates. In response, Ziegmann emailed Altra with Auen Trucking's address in Schleswig, Iowa.

---

[5] In the early stages of the parties' negotiations—before ZTraps hired Altra to treat all 30,000 traps—Altra powder coated several traps as a sample of how the finished products would appear. Altra agreed to use those sample traps as a reference when sorting through the unsatisfactorily powder-coated traps.

As it turns out, Altra did hire Auen Trucking to ship the traps back to Minnesota. At Altra's direction, Auen picked up the traps from Kiron in October 2016 and transported them to Big Lake, Minnesota. Altra completed the recoating in January 2017. Before returning the traps to Iowa, Altra emailed Ziegmann asking for payment of the September 2016 invoice. The next day, Thielen visited Altra's office and dropped off a check from ZTraps. Then Altra reached out to Ziegmann to coordinate a delivery time. Auen Trucking retrieved the traps from Altra and shipped them back to ZTraps.

But ZTraps was even more disgruntled with Altra's remedial work. ZTraps believed Altra "negligently re-powder coated approximately 6,000 individual traps at high temperature," causing reduced "spring tension that rendered the traps completely worthless." So, in October 2017, ZTraps sued Altra in Crawford County, Iowa. The suit alleged (1) breach of contract, (2) breach of warranty, and (3) negligence. ZTraps asked the court to award damages equal to the market price not only for the recoated traps, but for all 25,716 traps Altra powder coated.

In December 2017, Altra moved to dismiss ZTraps's claims, asserting the district court lacked personal jurisdiction over the non-resident company. In its motion, Altra emphasized Thielen—a Minnesotan—solicited its services. Altra maintained, before the parties reached an agreement, Altra "corresponded and negotiated exclusively with Thielen." And Altra asserted it first learned ZTraps was located in Iowa when it received the original purchasing order. Altra added, "At no time whatsoever did [Altra] or its representatives personally visit [ZTraps] in the State of Iowa."

ZTraps resisted the motion to dismiss. Unlike Altra's focus on the initial solicitation, Ztraps underscored the latter portion of the parties' relationship. For instance, not only did Altra agree to powder coat the product of an Iowa manufacturer, but when that Iowa company was dissatisfied with Altra's performance, Altra hired another Iowa company to retrieve the traps from Kiron and ship them to Minnesota. After recoating the traps, Altra paid to ship them back to ZTraps.

After the parties submitted affidavits and exhibits, the district court granted Altra's motion to dismiss for lack of personal jurisdiction. The court focused on the parties' preliminary negotiations and found Altra's performance occurred entirely in Minnesota. The court decided Altra's "only purposeful contact or activity" in Iowa was "communications and delivery." And the court believed those contacts were "secondary or ancillary factors of the agreement," which could not support personal jurisdiction. ZTraps appeals.

## II.     Standard of Review.

We review a district court's dismissal for lack of personal jurisdiction for correction of errors at law. *Sioux Pharm, Inc. v. Summit Nutritionals Int'l, Inc.*, 859 N.W.2d 182, 188 (Iowa 2015) (citing *Shams v. Hassan*, 829 N.W.2d 848, 853 (Iowa 2013)). While we are not obliged to accept the court's legal conclusions, we are bound by its fact findings when supported by substantial evidence. *Id.* (citing *Shams*, 829 N.W.2d at 853).

In our personal-jurisdiction inquiry, we accept as true facts alleged in the petition and uncontroverted affidavits. *Id.* (quoting *Shams*, 829 N.W.2d at 853). The burden rests with the ZTraps to make a prima facie showing personal

jurisdiction is appropriate, then the burden shifts to Altra to rebut that showing. *See id.* (quoting *Shams*, 829 N.W.2d at 853).

**III.    Analysis.**

The power of Iowa courts to exercise personal jurisdiction over Altra, as a nonresident defendant, finds limits in our rules and the Due Process Clause of the Fourteen Amendment. *See Ostrem v. Prideco Secure Loan Fund, LP*, 841 N.W.2d 882, 891 (Iowa 2014). The key jurisdictional rule provides: "Every corporation, individual, personal representative, partnership or association that shall have the necessary minimum contact with the state of Iowa shall be subject to the jurisdiction of the courts of this state." Iowa R. Civ. P. 1.306. Our supreme court interprets this rule to authorize "the widest jurisdictional parameters" allowed by due process. *See Sioux Pharm*, 859 N.W.2d at 188.

Under that due-process analysis, we look to see whether Altra had sufficient minimum contacts with Iowa so that maintaining the lawsuit does not offend traditional notions of fair play and substantial justice. *See Ostrem*, 841 N.W.2d at 891 (quoting *Viasystems, Inc. v. EBM–Papst St. Georgen GmbH & Co.*, 646 F.3d 589, 594 (8th Cir. 2011)). To be sufficient, Altra's contacts with Iowa must show the kind of connection that would make it "fair and reasonable" to require Altra to come here and defend ZTrap's action. *See id.* (quoting *Ross v. First Sav. Bank of Arlington*, 675 N.W.2d 812, 815 (Iowa 2004)).

Put another way, the test is whether Altra should have reasonably anticipated being "haled into court" in Iowa. *See id.* (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

Personal jurisdiction comes in two forms—general and specific. *Id.* at 892 (citing *Shams*, 829 N.W.2d at 855). General jurisdiction authorizes a state to "adjudicate any cause of action involving a particular defendant, regardless of where the cause of action arose." *Id.* at 892 (quoting *Sondergard v. Miles, Inc.*, 985 F.2d 1389, 1392 (8th Cir. 1993)). On the other hand, "[s]pecific jurisdiction refers to jurisdiction over causes of action arising from or related to a defendant's actions within the forum state." *Id.* (quoting *Sondergard*, 985 F.2d at 1392). ZTraps relies only on specific jurisdiction in contesting the dismissal.

When deciding the constitutionality of specific personal jurisdiction, we focus on "the relationship among the defendant, the forum, and the litigation." *Shams*, 829 N.W.2d at 855. Our minimum-contacts analysis has two prongs.[6] First, we must consider whether Altra has purposefully directed its activities at Iowa residents. *See Sioux Pharm, Inc.*, 859 N.W.2d at 189 (quoting *Capital Promotions, L.L.C. v. Don King Prods., Inc.*, 756 N.W.2d 828, 834 (Iowa 2008)). Second, ZTraps's litigation must result from alleged injuries arising out of or relating to those activities. *See id.*

If ZTraps can satisfy both prongs of the minimum-contacts test, we then consider whether the exercise of personal jurisdiction would offend "traditional notions of fair play and substantial justice." *See Int'l Shoe Co. v. Washington*, 326

---

[6] Our supreme court formerly employed a five-factor minimum-contacts test, considering "the quantity of a defendant's contacts with Iowa, the nature and quality of those contacts, the source of the contacts and their connection to the cause of action, Iowa's interest in the litigation, and the convenience to the parties." *Ostrem*, 841 N.W.2d at 892. In recent years, the supreme court has favored the modern two-part test. *Id.* at 892–93.

U.S. 310, 316 (1945); *see also Sioux Pharm, Inc.*, 859 N.W.2d at 196 (describing steps of analysis).

### A. Minimum Contacts

*1. Did Altra purposefully direct activities at Iowa?*

In answering this question, we probe whether Altra conducted the kind of activities in Iowa that would invoke "the benefits and protections" of our laws. *See Hanson v. Denckla*, 357 U.S. 235, 253 (1958). In examining the conduct, we "recognize a stronger interest in seeing jurisdiction extended to nonresident sellers than to nonresident purchasers." *Cascade Lumber Co. v. Edward Rose Bldg. Co.*, 596 N.W.2d 90, 92 (Iowa 1999).

But Altra's contract to sell powder coating to ZTraps cannot alone establish sufficient minimum contacts to permit Iowa to exercise specific personal jurisdiction. *See Ostrem*, 841 N.W.2d at 892. Instead, we view their contract as a way to oversee "the real object" of their business transactions. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479 (1985). At issue are prior negotiations, contemplated future consequences, the contract's terms, and the parties' course of dealing.

In arguing Altra purposefully directed its activities at Iowa, ZTraps points to these factors:

> (1) Altra received a purchase order identifying ZTraps as an Iowa company;
>
> (2) Altra knew, no later than June 2016, that the powder coating was to be done for an Iowa business

(3) Negotiations and communications regarding the agreements between Altra and ZTraps were based, at least in part, in Iowa;

(4) Formation of the agreement between Altra and ZTraps was, at least in part, in Iowa;

(5) Altra, by hiring Iowa-based Auen Trucking, picked up the traps in Iowa, modified them, then returned them to Iowa, again by commissioning Auen Trucking for the shipping.[7]

(6) Altra reasonably would have known the finished traps were to be sold in Iowa.

To counter, Altra insists it did not "purposefully direct" its activities at Iowa because it did not "unilaterally inject itself into doing business" here. Rather, ZTraps started the contact. *See All Tech Inc. v. Power Prods. Co.*, 581 N.W.2d 202, 204 (Iowa Ct. App. 1998) (finding it "critical in our analysis that the business relationship was not solicited by Power Products, but rather, by All Tech, which actively sought a company who could accommodate their business needs"); *OmniLingua, Inc. v. Great Golf Resorts of World, Inc.*, 500 N.W.2d 721, 725 (Iowa Ct. App. 1993) (highlighting that resident plaintiff solicited the contract).

Altra also emphasizes it was to perform the powder coating—the subject of the contract—in Minnesota. Altra contends the remedial powder-coating is inconsequential to the minimum-contacts analysis because the contract did not contemplate those accommodations.[8] And Altra maintains even if we do consider

---

[7] ZTraps lists the second shipping of the traps as three distinct contacts.

[8] Altra relies on *Scullin Steel Co. v. National Railway Utilization Corp.*, 676 F.2d 309 (8th Cir. 1982), in arguing its communications with and delivery to Iowa cannot support personal jurisdiction in Iowa. But in *Scullin Steel*, the court concluded "[a]ll of the negotiations, before and after the execution of the sales agreement, were conducted in Pennsylvania, not in Missouri [the forum state]." 676 F.2d at 313. And the crux of the court's decision was its rejection of the plaintiff's ability to "rel[y] upon its own performance

its corrective measures, the transaction was merely "[a] single shipment of products into the forum state," representing a "'casual' or 'fortuitous' contact rather than a significant contact." *See Digi-Tel Holdings, Inc. v. Proteq Telecomms. (PTE), Ltd.*, 89 F.3d 519, 523 (8th Cir. 1996).

Contrary to Altra's argument, a nonresident defendant need not initiate the business relationship to satisfy the minimum-contacts test. *See, e.g.*, *Hager v. Doubletree*, 440 N.W.2d 603, 607 (Iowa 1989) ("The defendants in this case place great reliance on the fact that the initial contact was made by Iowa National, not the defendants. . . . While Iowa National initiated the contacts in Wyoming, what followed was a continuing business relationship which itself is the basis for jurisdiction under the reasoning of *Burger King*. This situation is a little like a marriage: while it was Iowa National who proposed, Doubletree accepted, and the resulting relationship makes it relatively insignificant which party started it all."). We realize it was ZTraps who "proposed" to Altra, through matchmaker Thielen. But Iowa courts may still have gained specific personal jurisdiction over Altra through its continued course of dealing with ZTraps. Altra agreed to "marry" ZTraps, knowing it was an out-of-state company and even spent funds in Iowa to patch up their relationship when it grew rocky.

Yet Altra insists the companies' course of dealing did not justify jurisdiction. Altra analogizes this case to the *All Tech Inc.* case. 581 N.W.2d at 202. In *All Tech*, an Iowa buyer reached out to an Oklahoma seller, Power Products, to

---

under the contract within the forum to supply the requisite minimum contacts." *Id.* at 313. By contrast, the district court here found "the negotiations and communications between the parties occurred at least in part in Iowa." Altra does not argue that fact finding is unsupported by substantial evidence. So *Scullin Steel* is inapt.

purchase a single power unit. *Id.* at 203. The Iowa buyer visited Oklahoma to view the unit. *Id.* Then Power Products delivered the unit "via an independent shipper" to All Tech in Iowa.[9] *Id.* When the unit failed one year later, All Tech sued the Oklahoma company. *Id.* Our court decided Oklahoma-based Power Products did not purposefully direct its activity at All Tech. *Id.* at 205. Critical to our analysis was the fact the Iowa buyer solicited the business relationship. *Id.* at 204. Altra encourages us to do the same here.

To do so would be to ignore key factual differences. In *All Tech*, the dispute involved the sale of a single product. *Id.* at 205. Whereas here, the parties negotiated for Altra to powder coat 30,000 products for ZTraps, knowing they would be shipped back to Iowa for sale. Although it was a single transaction, the quantity of products is relevant in deciding whether a nonresident purposefully availed itself of the privilege of conducting activities in the forum state. *See Book v. Doublestar Dongfeng Tyre Co., Ltd.*, 860 N.W.2d 576, 578 (Iowa 2015) (noting, in application of stream-of-commerce test, "Doublestar actually shipped thousands of tires (albeit not the accident tire) into Iowa").

An even greater distinction from *All Tech* is Altra's ongoing interactions with ZTraps after the nearly 30,000 painted traps were first returned to Iowa. In *All Tech*, the Iowa buyer entered a one-and-done business transaction with the Oklahoma seller. 581 N.W.2d at 205. By contrast, Altra continued its dealings with Thielen after ZTraps received the original shipment of powder coated traps. Altra agreed to an "accommodation" when ZTraps was unhappy with the

---

[9] The court did not specify which party was responsible for shipping costs.

"inconsistent paint quality." That accommodation included hiring an Iowa trucking company to retrieve the traps from Kiron, sorting through the traps to identify those that needed repainting, repainting the traps, and employing the same Iowa trucking company to return the traps to Kiron. Altra continued to direct its activities toward Iowa residents in making that accommodation.

In sum, the district court distilled Altra's contacts with Iowa to these facts:

(1) Altra knowingly executed an agreement with an Iowa manufacturer to powder coat 30,000 traps.

(2) Their negotiations occurred, at least in part, in Iowa.

(3) After ZTraps expressed its dissatisfaction with the powder coating, Altra—using Auen Trucking—entered Iowa and retrieved products manufactured in Iowa.

(4) After modifying those products, Altra returned them to the Iowa manufacturer.

Those contacts constitute Altra's purposeful availment of the privilege of conducting activities within Iowa, "thus invoking the benefits and protections of its laws." *See Sioux Pharm, Inc.*, 859 N.W.2d at 189. Altra's contract with Iowa-based ZTraps was not the nonresident's sole connection to the forum state. Rather, Altra's many and ongoing contacts with Iowa showed a significant contractual relationship justifying the exercise of personal jurisdiction. On top of the original contract negotiations, we consider the subject matter of the contract (30,000 traps), the prolonged business relationship with an Iowa company resulting from the contract, and Altra's later agreement to transport the traps out of and back into Iowa.[10] *See Ostrem*, 841 N.W.2d at 892; *see also Cascade*

---

[10] In *Diamond Crystal Brands, Inc. v. Food Movers International, Inc.*, 593 F.3d 1249, 1268–69 (11th Cir. 2010), the Eleventh Circuit described contract-related considerations:

*Lumber*, 596 N.W.2d at 93 ("Although Rose would characterize the negotiations as a simple placement of an order, Cascade's affidavit shows four months of making arrangements, through multiple phone conversations, for the construction in Iowa of made-to-order trusses.").[11]

Because Altra chose to maintain a continuing relationship with ZTraps involving a great deal of Iowa merchandise and took responsibility for transporting that merchandise out of and into Iowa, Altra's contacts with forum state were not "random," "fortuitous," or "attenuated." *See Burger King*, 471 U.S. at 480 (explaining where nonresident defendant "deliberately" creates "continuing obligations" between himself and residents of the forum, "he manifestly has availed himself of the privilege of conducting business there"). As Altra's activities enjoyed "the benefits and protections" of the forum's laws, it is reasonable to require the company to submit to the burdens of litigation here as well. *See id.*

*2. Does the dispute result from or arise out of Altra's contacts with Iowa?*

Finding Altra purposefully directed its activities at Iowa residents, we must next determine whether ZTraps's claims arise out of or relate to those activities. "A single contact with the forum state can be sufficient to satisfy due process

---

Jurisdiction is often found where further contacts or plus factors connect the defendant to the jurisdiction. Courts have considered a defendant's initiating the contractual relationship, visiting the plaintiff's factory to assess or improve quality, sending materials to the plaintiff for inspection or use in shipping, participating in the manufacturing process, establishing a relationship by placing multiple orders, requiring performance in the forum, negotiating the contract via telefaxes or calls with the plaintiff, the list goes on.

(internal citations and footnotes omitted).

[11] In *Cascade Lumber*, the performance of the contract took place in Iowa, but the defendant never came to Iowa. 596 N.W.2d at 93.

concerns when the plaintiff's claim arises out of the contact." *Shams*, 829 N.W.2d at 855 (citing *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)).

On this second prong of the minimum-contacts analysis, Altra asserts this litigation resulted from conduct in Minnesota, not Iowa. Altra reasons each of ZTtraps's causes of action arose out of the powder-coating process in Big Lake.

Although Altra is right on the facts, its view of the law is too narrow. Altra's contacts with Iowa furthered its agreement with ZTraps. ZTraps's claims arose out of that agreement as a whole, not just the performance in Minnesota. *See Addison Ins. Co. v. Knight, Hoppe, Kurnik & Knight, L.L.C.*, 734 N.W.2d 473, 475, 477–78 (Iowa 2007) (finding claim of malpractice in filing Illinois appeal arose out of or related to defendant's relationship with Iowa client). Similarly, ZTraps's lawsuit arises out of and relates to its business relationship and course of conduct with Altra. *See Douglas Mach & Eng'g Co., Inc. v. Hyflow Blanking Press Corp.*, 229 N.W.2d 784, 791 (Iowa 1975) (disagreeing with district court's conclusion that the plaintiff's action was based on a matter outside the contract).

Given the nature and quality of Altra's contacts with ZTraps in Iowa, the nonresident should have anticipated being haled into Iowa courts for matters involving those contacts. *See Bankers Trust Co. v. Fidata Trust Co. New York*, 452 N.W.2d 411, 414 (Iowa 1990).

**B. Fair Play and Substantial Justice**

Finally, we must consider whether the exercise of "personal jurisdiction would comport with 'fair play and substantial justice.'" *Ostrem*, 841 N.W.2d at 903. "[J]urisdictional rules may not be employed in such a way as to make litigation 'so gravely difficult and inconvenient' that a party unfairly is at a 'severe disadvantage'

in comparison to his opponent." *Burger King Corp.*, 471 U.S. at 478. To defeat jurisdiction, Altra must offer a compelling case that its burden in litigating in Iowa would "clearly outweigh" the interests of ZTraps and the state in adjudicating the dispute here. *Shams*, 829 N.W.2d at 860.

To make that case, Altra asserts litigation in Iowa would "create a significant burden" on the company. It points to witnesses, facilities, and equipment relevant to the action and located in Minnesota. Altra acknowledges Iowa "has some interest in adjudicating a dispute and protecting the interests of an Iowa company" and that it would be more convenient for ZTraps to litigate in its home state. But Altra argues those interests are "minimal." Altra contends "transporting all 30,000 traps, or simply a small sampling of the traps, is far more convenient and practical than transporting an entire company's staff, facilities, and equipment, which is effectively impossible."[12]

The burden on Altra of defending the action in Iowa would be no greater than the burden on ZTraps of litigating in Minnesota. So this factor does not create a "compelling case" for Altra. *See Ostrem*, 841 N.W.2d at 903 (comparing burdens of litigating in respective states). Altra's description of potential inconvenience does not reach "*constitutional* magnitude." *See Burger King Corp.*, 471 U.S. at 484.

And Iowa has "a legitimate interest in adjudicating a dispute between one of its residents," ZTraps, "and an out-of-state entity that established contacts with

---

[12] Altra does not explain why it would be necessary to transport the entire staff, facilities, and equipment to defend against ZTraps's claims.

this state." *See Ostrem*, 841 N.W.2d at 903. Requiring Altra to litigate in Iowa courts does not offend traditional notions of fair play and substantial justice.

To recap, Altra had the requisite minimum contacts with Iowa to support the exercise of personal jurisdiction in ZTraps's lawsuit. The exercise of personal jurisdiction over Altra tracks fair play and substantial justice. For these reasons, we reverse the district court and remand for further proceedings.

**REVERSED AND REMANDED.**